## STANDARD BRANDS, Inc., v. NATIONAL GRAIN YEAST CORPORATION.

### No. 4552.

District Court, D. New Jersey.
Oct. 29, 1937.

Alexander T. Schenck, of Newark, N. J. (Watson, Bristol, Johnson & Leavenworth and L. A. Watson, all of New York City, and C. V. Johnson, of New York City, of counsel), for plaintiff.

Winne & Banta, by John A. Christie, all of Hackensack, N. J. (Fish, Richardson & Neave, Stephen H. Philbin, and Paul R. Ames, all of New York City, of counsel), for defendant.

FAKE, District Judge.

In this suit the plaintiff seeks injunctive relief and accounting for the alleged infringement of five patents. The defendant attacks the validity of the patents and denies infringement. The subject matter is the production of yeast. The patents bearing thereon and involved in this suit are: Hayduck, No. 1,449,103; Hayduck, No. 1,449,105; Hayduck, No. 1,449,106; Hayduck, No. 1,449,109; and Corby et al., No. 1,673,735. These patents will be considered in sequence as above set out.

### Hayduck, No. 1,449,103.

This patent was before the District Court of Maryland in Fleischman Yeast Company v. Federal Yeast Corporation, 8 F.(2d) 186, and there adjudicated valid and infringed, and on appeal the conclusions of the District Court were affirmed in (C.C.A.) 13 F.(2d) 570. All of the issues raised there are again raised here with certain additions. A study of the opinions in the foregoing cases, coupled with a study of the prior state of the art, including the additional matter introduced here, again leads to the conclusion that this patent is valid for the reasons set forth in the aforesaid opinions, and nothing which has been introduced here tends to change that result.

The question of infringement will now be considered. It was conceded at the trial that the use of aqua ammonia by the defendant constitutes an infringement if the patent is valid, and, having found the patent valid, it follows that defendant infringes in that particular use. This still leaves open for adjudication here the question of defendant's infringement in the use of ammonium lactate and di-ammonium phosphate.

Looking to claims 1, 2, 3, and 4 of this patent, it is found that the patentee teaches the use of "an innocuous antacid substance" to neutralize the deleterious excess of acidity formed in the process of manufacture of yeast; that such antacid shall be added during propagation, and shall be of such a nature as to supply yeast-assimilable nitrogen

to the yeast. Is ammonium lactate such a substance, or does it operate as an antacid when used in the defendant's process of propagation?

As to the substance known as ammonium lactate, plaintiff's expert among other things testified as follows:

"Q. * * * When that solution containing the ammonium lactate is put in the fermenter, is the solution acid? A. It is in general acid. * * *"

It follows, of course, that, if it is an acid, it is not antacid. As to whether or not the use of this substance by the defendant operates as an antacid in reducing the excess of acidity in the wort, Plaintiff's Exhibits 13, 14, and 15, being defendant's mash sheets, disclose the defendant's operations and show as a whole an increase and not a decrease of acidity as the ammonium lactate is added to the propagating tank. Taking this evidence and weighing the same in connection with other evidence bearing upon the point, it is clear that the defendant does not infringe this patent in the use of ammonium lactate.

The question must now be answered as to whether or not di-ammonium phosphate is an antacid and whether or not its use by the defendant operates as such in defendant's process of propagation. The ammonia content in di-ammonium phosphate is an antacid and the phosphate is an acid. As to whether then these substances, when combined as di-ammonium phosphate, operate in defendant's process as an antacid, depends upon whether the yeast consumes more of the ammonia content or more of the phosphate content. In this connection, six of defendant's mash sheets were offered in evidence. They show some thirty additions of di-ammonium phosphate, ten of which indicated an increase of acidity, fourteen showed no change in acidity, and six indicated a decrease in acidity but these decreases were slight. This leads to the conclusion that the di-ammonium phosphate which defendant uses in the course of propagation is fed in not for the purpose of correcting an excess of acidity but rather as a yeast nutrient and as such its use was old in the art. In so far as its use happens to correct the excess of acidity, the amount of correction involved is so small and unimportant that the conclusion must be reached that the correction of acidity is a mere incident to the use of the di-ammonium phosphate as a nutrient.

This patent is not intended to cover, nor does it cover, all antacid substances. It covers only those innocuous substances which, when used, neutralize the deleterious excess of acidity in the wort. It therefore follows that the defendant does not infringe in its use of di-ammonium phosphate.

### Hayduck No. 1,449,105.

Dealing with this patent, in the case of Standard Brands v. Federal Yeast Corporation (D.C.) 38 F.(2d) 329, at page 337, the court held among other things as follows: "It appears that certain of the features of patent 105, taken separately, were known to the prior art. The division of the wort into two parts, the beginning of propagation in one part, which had been diluted, and the addition of the other part continuously or at intervals, the restriction of alcohol production by regulating the supply of sugar—these several suggestions may be gathered together from the literature. But no publication shows the combination of elements found in claims 4 and 10 of the patent. These claims contain not merely the negative admonition that the sugar material be not fed too fast to the growing yeast. They indicate, when considered in the light of the specification, a process wherein the yeast is constantly given new supplies of all necessary nutriment by a continuous addition, so that there is always a wort concentration for the efficacious growth. The regulation of the rate of addition so that the yeast may propagate and substantially all the alcohol formed may be assimilated, and the maintenance of substantial constancy of concentration of nutriment, through regulation of the rate of addition, are not found in any reference in combination with the other elements expressed in these claims."

The foregoing indicates that the court was of the opinion that claims 4 and 10 of the patent, when read in the light of the specification, teach a process of regulation, wherein the rate of addition of reserved materials to feed the growing yeast is made clear and certain. In the instant suit, issue is sharply joined on this point, the plaintiff asserting that the said claims and specification do instruct definitely as to the rate, while the defendant urges to the contrary.

The facts and arguments presented here differ very materially from those which were presented in the Maryland case. Here much emphasis has been laid upon the in-

tent and meaning of the specification found in lines 90 to 95, inclusive, plaintiff contending that these lines illuminate the claims, thereby furnishing instructions as to the rate of feed to be supplied to the growing mash. Claim 4 of the patent, being typical as to this point, reads as follows: "substantially continuously adding during the period of propagation, a wort of higher concentration, at a rate such that the yeast may propagate and substantially all of the alcohol which may be formed is assimilated by the yeast."

This claim, standing alone, is indefinite, vague, and uncertain as to the rate involved. It, in effect, directs the reader to experiment and find out for himself by methods of trial and error, if he can, just what the rate ought to be to produce the assimilation of alcohol as claimed. This then leads to an examination of the specification for the purpose of ascertaining whether or not it casts sufficient light on the claims so that one skilled in the art could with some degree of certainty work out the rate by mathematical calculation. Lines 64 to 95 of the specification read as follows:

"The process may be, for example, executed in the following manner:

"A wort adapted for yeast propagation (having, for example, gravity of 12° Balling) is prepared according to the procedure commonly followed in the compressed yeast industry. A part of this wort is placed in the fermenting vat and is highly diluted (for example, to about 1° Balling), yeast is added thereto and it is aerated. Thereupon the remainder of the concentrated wort is added slowly and substantially continuously throughout a protracted period of time and at a rate such that not only the alcohol which may have been formed from the quantity of sugar present in the diluted portion of the wort, but also any alcohol which may be formed from the sugar which is present in the added wort, can be assimilated immediately by the yeast. If arrangements are made to carry on the aeration process for ten hours, the addition of the wort may be effected for about seven to eight hours under continuous aeration and the aeration may be subsequently continued for two to three hours without the addition of any wort. *The quantity of the diluted wort which is originally available for the yeast is so chosen, for example, that the mean content of the entire wort employed would be 3° to 5° Balling.*"

The above specification when analyzed may be briefly summarized as follows:

(1) Prepare a wort of 12° Balling.

(2) Take a quantity of the 12° Balling and dilute it to 1° Balling.

(3) Put the diluted 1° Balling in a fermenting vat.

(4) Put seed yeast in the fermenting vat with the 1° Balling and aerate.

(5) Feed from the remaining 12° Balling into the fermenting vat wherein the 1° Balling and seed yeast are working.

As to the foregoing five points, the parties to this suit seem in full accord. The question arises, however, as to what rate the 12° Balling shall be fed into the fermenting vat as indicated by (5) above. Referring to the specification, it is found that it must be "added slowly and substantially continuously," and the rate of feeding or adding the same should be "such that not only the alcohol which may have been formed" from the sugar in the diluted portion in the fermenting vat but also any alcohol present in the 12° Balling as added can be assimilated immediately by the yeast. It is obvious that thus far nothing specific is disclosed as to the rate at which the 12° Balling is to be fed into the fermenting vat. True, it directs that it shall be at that rate which will permit the immediate assimilation of the alcohol by the yeast but it leaves the inquirer to experiment and by trial and error find out for himself what the rate may be. Bearing in mind that a full and complete disclosure is now being sought as to the rate, attention is directed to lines 90 to 95, inclusive, of the specification which are above italicized. Do these lines disclose to one skilled in the art the necessary factors upon which the rate and quantity involved may readily be calculated? Is the meaning clear and unambiguous? A large part of the record and argument on this patent has revolved about these two questions.

Plaintiff's leading witness, a prominent chemist and expert, testified that the lines 90 to 95 in the specification, when read in the light of other language in the specification, direct the making of the 12° wort; the removal of a quantity thereof and the reducing of the same to 1° Balling by the addition of water and the placing of this diluted quantity in a fermenting vat, then the adding of the 12° wort to the diluted quantity until the same rises from 1° Balling to from 3° to 5° Balling. This was

demonstrated by an experiment before the court. The witness then further testified that the rule he deducted from the specification as well as the experiment before the court related only to solutions before any yeast whatever had been grown therein.

Defendant's leading witness, a prominent chemist and expert, who was also qualified as a practical yeast manufacturer, testified that the instructions contained in the specification as bearing upon the 3° to 5° Balling teach the maintaining of a 3° to 5° Balling in the wort employed, and that the said Balling could be maintained only by tests made during the process of manufacture. He further testified that the rate of feed from the 12° Balling wort would vary, depending upon the kind of materials employed. Thus is disclosed a sharp conflict between the parties as to what the claims when read with the specification actually disclose.

My conclusion is that claims 4 and 10, when read in the light of the specification, are vague and uncertain, even when read and studied by those who are expert and skilled in the art.

■ In Chemical Rubber Co. v. Raymond Rubber Co. (C.C.A.3) 71 F. 179, 183, a quotation appears from Consolidated Electric Light Co. v. McKeesport Light Co., 159 U.S. 465, 474, 16 S.Ct. 75, 40 L.Ed. 221, as follows: "If the description be so vague and uncertain that no one can tell, except by independent experiments, how to construct the patented device, the patent is void."

Again in Krupp Aktien-Gesellschaft v. Midvale Steel Co. (C.C.A.3), 191 F. 588, 602, the following appears: "In other words, the teaching of the specification and the disclosure by the patentee must be such that, after the patent has expired, a user thereof shall not be left to the blind groping of experimental work, but by the plain teaching of the specification be enabled to use the process with certainty."

See, also, George K. Hale Mfg. Co. v. Hafleigh & Co. (C.C.A.) 52 F.(2d) 714, 719, a case in this circuit wherein Judge Kirkpatrick ruled as follows: "There must be hundreds of shades of blue, possibly thousands, and there is no indication of what shades require this combination of ingredients. Further, there is nothing to indicate the proportions to be used. The most extensive experimentation would be necessary before it could be determined what blue dyestuffs in what proportions would produce a commercial result. The law is clear that such a disclosure will not support a valid claim."

Again in Health Products Corporation v. Ex-Lax Mfg. Co., Inc. (C.C.A.2) 22 F.(2d) 286, 287: "It is scarcely necessary to labor the principle that specifications must be more than a suggestion for promising experiment, hit or miss. They must contain complete directions, leading with certainty to the result."

See, also, Hebe Co. v. Enz (C.C.A.7) 283 F. 977, 978; De Lamar v. De Lamar Min. Co. (C.C.A.9) 117 F. 240, 247; Finley v. Mac Dougald Const. Co. (C.C.A.5) 28 F.(2d) 674, 675.

In the light of the foregoing citations and the evidence produced here bearing upon the validity of the patent, and also considering the differences between the record here and the record in the Maryland court, I can come to no other conclusion than that the Hayduck patent 1,449,105 is invalid.

### Hayduck, No. 1,449,106.

■ The claims of this patent cover the neutralization of deleterious acidity as disclosed in the claims of Hayduck, No. 1,449,103, bearing upon the propagation of yeast coupling the same with the rate of feeding as covered by Hayduck, No. 1,449,105. Having hereinbefore found the last-mentioned patent invalid, its combination with a valid patent adds nothing to the art. This patent is therefore invalid.

### Hayduck, No. 1,449,109.

■ In substance this patent covers the same field as those hereinbefore considered. Its disclosure of the use of a nitrogenous neutralizing agent adds nothing to the art since Hayduck, No. 1,449,103, makes that disclosure. It is therefore invalid.

### Corby et al., No. 1,673,735.

■ This patent makes disclosures similar to those found in Hayduck, No. 1,449,105, and Hayduck, No. 1,449,106. The gist of the additional teaching found therein is the periodic withdrawal during propagation of a portion of the yeast containing liquid from the fermenter, diluting the residue left in the fermenter, and restoring the starting conditions therein, thereby increasing the productive capacity of the fermenter. This contemplates a harvesting of a portion of the yeast crop as and when it ripens and the planting of a new crop in the area vacated. It amounts to no more than the exercise of the ordinary skill to be

expected of those versed in the art. The idea is as old as the harvesting of agricultural crops when they ripen and the reseeding of the area thus vacated. The patent is invalid for want of patentable novelty.