STANDARD BRANDS, Inc., v. NATIONAL GRAIN YEAST CORPORATION.*

NATIONAL GRAIN YEAST CORPORATION v. STANDARD BRANDS, Inc.

Nos. 6651, 6670.

Circuit Court of Appeals, Third Circuit.

Feb. 1, 1939.

*Writ of certiorari granted 59 S.Ct. 645, 83 L.Ed. ——.

Watson,, Bristol, Johnson & Leavenworth, of New York City (L. A. Watson and C. V. Johnson, both of New York City, of counsel), for plaintiff-appellant.

Stephen H. Philbin and Paul R. Ames, both of New York City, and Walter G. Winne, of Hackensack, N. J., for defendant-appellant.

Before BIGGS, Circuit Judge, and DICKINSON and MARIS, District Judges.

BIGGS, Circuit Judge.

There are two appeals in the case at bar. The original suit was brought by Standard Brands, Incorporated, plaintiff-appellant in No. 6651 and plaintiff-appellee in No. 6670, vs. National Grain Yeast Corporation, defendant-appellee in No. 6651 and defendant-appellant in No. 6670. For the sake of clarity in this opinion we will not make use of the words appellant and appellee but will refer to Standard Brands, Incorporated, and National Grain Yeast Corporation. The bill of complaint alleges that Friedrich Hayduck was the first, original and sole inventor of certain new and useful improvements in the process for the manufacture of compressed yeast and the product described and claimed in United States Patent No. 1,449,103, issued March 20, 1923, and that he was also the inventor of certain new and useful improvements in a low-alcohol yeast process described and claimed in United States Patents Nos. 1,449,105, 1,449,106 and 1,449,109, issued upon March 20, 1923; that Robert L. Corby and Wilhelm H. Bührig were the first, original and joint inventors of certain new and useful improvements in a process for the manufacture of yeast described and claimed by them in United States Patent No. 1,673,735, issued upon June 12, 1928; that all the rights of the named individuals in these respective patents were assigned to Standard Brands, Incorporated; and that National Grain Yeast Corporation has infringed and is now infringing these patents.

To the bill of complaint National Grain Yeast Corporation filed an answer denying the validity of the patents and denying infringement. We conceive that the questions presented may be disposed of most expeditiously by treating the patents separately, but before embarking upon this separate treatment we think that we should state that the learned District Judge found

Hayduck Patent No. 1,449,103 to be valid and found it to be infringed by one of the processes used by National Grain Yeast Corporation which may be described for the sake of brevity as the aqua ammonia process. The District Judge found that Hayduck Patent No. 1,449,105 was invalid because of indefiniteness and therefore made no finding as to its infringement. He found that Hayduck Patent No. 1,449,106 was invalid because it consisted of a combination of the processes disclosed by Hayduck No. 1,449,103 with Hayduck No. 1,-449,105, and that since the latter patent was invalid its combination with a valid patent added nothing to the art of making yeast. The District Court made no finding as to infringement in respect to the patent last named. The District Judge also held that Hayduck Patent No. 1,449,109 was invalid in that it added nothing to the art beyond Hayduck No. 1,449,103, but made no finding as to the infringement of this patent. He held Corby and Bührig Patent No. 1,673,735 invalid for want of patentable novelty and made no finding as to its infringement.

Standard Brands, Incorporated, appeals from a decree of the District Court embodying the findings set forth in the previous paragraph of this opinion, except in so far as it holds Hayduck Patent No. 1,-449,103 valid and infringed, grants an injunction and directs an accounting. National Grain Yeast Corporation appeals from that part of the decree of the District Court holding the claims in controversy of Hayduck Patent No. 1,449,103 to be valid and infringed, granting an injunction and directing an accounting and a recovery by Standard Brands, Incorporated. These appeals frame the issues before us.

For the purpose of brevity we will refer to the Hayduck patents hereafter by the last three numerals of the respective patent numbers. Hayduck –103 was held valid and infringed by the District Court of Maryland in Fleischmann Yeast Co. v. Federal Yeast Corporation, 8 F.2d 186, and this holding was affirmed by the Circuit Court of Appeals for the Fourth Circuit in 13 F.2d 570. Hayduck Patents –105 and –106 were held valid and infringed by the District Court of Maryland in Standard Brands, Incorporated, v. Federal Yeast Corporation, 38 F.2d 329. No appeal was taken to the Circuit Court of Appeals for the Fourth Circuit in the cited case.

■ Though these decisions are entitled to great weight the adjudications contained therein on the matters here in controversy are not binding upon us, and our decision, as was that of the District Judge below, must be based upon our independent judgment upon the questions, presented. New York Scaffolding Co. v. Liebel-Binney Co., 254 U.S. 24, 41 S.Ct. 18, 65 L.Ed. 112; Mast, Foos & Co. v. Stover Manufacturing Co., 177 U.S. 485, 20 S.Ct. 708, 44 L. Ed. 856; Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 50 S.Ct. 9, 74 L.Ed. 147.

As to Hayduck Patent No. 1,449,103.

Claims 1 to 4, inclusive, and 7 to 15, inclusive, of this patent are alleged to be infringed by National Grain Yeast Corporation. As we have stated, the learned District Judge held all of the claims referred to as valid. If they are valid one of the processes used by the National Grain Yeast Corporation, viz., the process which we have described heretofore as the aqua ammonia process, infringes the patent. The court below, referring to the decisions of the District Court of Maryland and that of the Circuit Court of Appeals for the Fourth Circuit, supra, stated, "A study of the opinions in the foregoing cases, coupled with a study of the prior state of the art, including the additional matter introduced here, again leads to the conclusion that this patent is valid for the reasons set forth in the aforesaid opinions, and nothing which has been introduced here tends to change that result." [21 F.Supp. 46.]

At this point we deem it necessary to make a brief statement of certain matters relating to the prior art. The art of manufacturing yeast is a very old one. Stating its principle in simplest terms, it consists of putting seed yeast into a nutrient solution which it devours and in which it propagates itself by budding. Yeast feeds upon sugar, making use of the carbon, nitrogen and other elements contained therein. Originally nutrient solutions were prepared by souring cereals with water in souring tanks, such cereals including corn, rye, barley and malt, all of which are organic materials as distinguished from inorganic materials. As the souring process continued in the souring tank and the materials contained therein tended to become homogeneous, the solution became slightly acid.

by reason of the creation of lactic acid. When the souring process had continued sufficiently, the nutrient solution or wort thus attained was drained off and put with the seed yeast into the fermenting tank where the actual propagation of yeast from the seed yeast took place. In later years, particularly during the course of the World War which required conservation of grains, molasses was used as the source of sugar in the making of nutrient solutions in lieu of cereals. In 1919 inorganic salts capable of nourishing yeast were used in place of organic nitrogenous materials. This forward step in the art properly may be described as revolutionary. Judge Soper, in Fleischmann Yeast Co. v. Federal Yeast Corporation, supra, so described it. With comparatively immaterial changes this method of producing nutrient solutions is substantially that used today.

We should state that the patent under discussion does not claim the method of producing nutrient solutions by the use of molasses and yeast nourishing inorganic materials. There is no patentable novelty in making use of such materials for the creation of nutrient solutions. Hayduck does not make such a claim.

The prior art makes plain that nutrient solutions must be slightly acid in order to stimulate the growth of the yeast and to prevent the formation of harmful bacteria or fungi. Nutrient solutions must not be too acid, however. The "new" process (called such to distinguish it from that which was very old in the art) of using inorganic yeast nourishing materials, such as ammonium sulphate, heightens the problem of acidity. If ammonium sulphate is used with molasses in a nutrient solution, as the yeast eats into it sulphuric acid is released and causes harmful acidity in the nutrient solution itself. Neither the problem of acidity nor its solution, as we will show hereafter, was new to the art. Nor did acidity result only when inorganic yeast nourishing salts were employed in the nutrient solution. As we have stated, when organic materials such as cereals were soured in the souring tank lactic acid was formed. An examination of the record, however, convinces us that the problem of excessive acidity caused comparatively little concern to manufacturers of yeast prior to the use of inorganic yeast nourishing salts which increased that acidity.

In the specification of the patent under consideration Hayduck states, "I have now discovered that unexpectedly high yeast yields are obtained when conducting the nutrition of the yeast with the use of solutions containing sugar and yeast-nutrient inorganic salts * * * if the acid components referred to as being set free during the yeast propagation and growth are neutralized either entirely or to such an extent that they no longer affect the yeast unfavorably. For such neutralization of the acid components, calcium carbonate may suitably be employed, but other basic or antacid substances such as antacid substances containing or supplying nitrogen can also be employed for the neutralization, for example ammonium carbonate."

As to the knowledge of the prior art in respect to neutralizing deleterious acidity, Hayduck states in his specifications, "It is known that there can be added to mashes in lactic fermentation, nitrogen-supplying antacid substances, as for instance ammonia, ammonium carbonate or ammonium carbamate, for the partial neutralization of the lactic acid progressively formed and for the augmentation of the yeast-assimilable nitrogen content of the mashes so that they may be utilized for subsequent yeast propagation.

"It is also known that an addition of basic or antacid substances to some fermenting liquids stimulates the fermentation, the injurious action of the acids on the life of the yeast being inhibited. Furthermore, there has already been some theoretical discussion with respect to the possibility of obtaining yeast on an industrial scale from solutions containing sugar and inorganic salts."

The references made by Hayduck to the prior art and the claimed differentiation over the prior art as thus summarized in his specifications would not appear to constitute invention in the light of the prior art. To repeat Hayduck's words, "It is also known that an addition of basic or antacid substances to some fermenting liquids stimulates the fermentation, the injurious action of the acids on the life of the yeast being inhibited." This is a recognition of the injurious nature of the acid created by feeding yeast and of the corrective action of an antacid substance. The claimed differentiation and the substance of Hayduck's invention is alleged to be in the unexpectedly large yield of

yeast obtained by the use of the process disclosed, but this in the absence of other factors upon which a discovery by Hayduck can be predicated would not appear to amount to invention.

We think that the test of invention to be applied to the patent sub judice may be summed up as follows: Patentable invention under the circumstances of the case at bar must consist of two elements; first, the inventor must discover the working of a natural law; second, he must put that natural law to effective use. In the case at bar Hayduck cannot claim and does not claim to be the discoverer of the fact that the growth of yeast may be stimulated by neutralizing the acid by an antacid. The operation of this natural law in respect to yeast was discovered by others before him and, as we will show, is a well established part of the prior art. Hayduck's claim is not that he has discovered the operation of the law but that he has put that natural law to use with unexpectedly good results. Both elements, however, must be present to constitute patentable invention. Hayduck, however, can claim and does claim only one, viz., the last.

Hayduck alleges invention in the unexpected production of an unusually large yield of yeast under his process, but he makes no disclosure as the discoverer of any natural law or of circumstances accounting for this exceptionally large yield. If he had done so, then he would have made an invention valid over the prior art. For example, if Hayduck had gone to Henneberg's experiments or the experiments of others in the art and had discovered that certain experiments had produced greater yields of yeast than others because of the operation of factors not perceived by Henneberg or prior workers such would have constituted invention. As a matter of fact the large yield of yeast is due to the use of an antacid, a reason recognized by Hayduck in his specification and by the prior art.

In respect to the prior art, it appears from the record before us and we think that it is apparent upon consideration of the opinion of the District Court for the District of Maryland in Fleischmann Yeast Co. v. Federal Yeast Corp., supra, that in all probability, W. Henneberg, the chemist to whom we have referred in the preceding paragraph, was among the first discoverers of the natural law which forms the basis of Hayduck's claimed invention. In an article published by Henneberg in Germany in 1908, entitled, "Brewing, Wines, Spirits, Etc. Yeasts: Influence of meal and other nitrogenous materials, salts and acids on the life and fermenting power of * * * in distilled water with sucrose and in worts", he states, "The author has carried out an extensive series of experiments which show that rye or wheatmeal, egg albumin peptone, lecithin and inorganic ammonium salts exhibit striking similarities in their action on yeasts." Henneberg then goes on to state the circumstances under which these substances are of nutritive value or are poisonous or non-poisonous in relation to yeast. He then states, "The inorganic ammonium salts have an approximately equal poisonous action on both kinds of yeast.[1] Under ordinary conditions, these nitrogenous substances form excellent nutrient materials for yeasts, their injurious action only appearing in the absence of certain salts, which are more especially compounds capable of neutralizing acids. The other salts able to annul this injurious action of the nitrogenous substances comprise all the calcium salts with the exception of the oxalate and, in much greater concentrations, magnesium sulphate, ammonium sulphate, potassium phosphate, etc.; the experiments show that calcium and certain other salts are capable of acting to some extent, on acids in such a way as to render them less harmful to the yeast. It must, therefore, be assumed that the nitrogenous compounds give rise, in the interior of the cells, to free acids, which, under normal conditions, are immediately rendered innocuous by the above-mentioned salts; if such salts are lacking, the acids exert a poisonous action on the cells. In the case of ammonium salts, these must undergo decomposition in order to take part in the formation of proteins, the acid of the ammonium salt being liberated; if, therefore, this acid has a poisonous action on yeast, the corresponding ammonium salt will have a similar action." See also an article similar in tenor derived from Henneberg published in the magazine "Pure Products" for May, 1908, in New York City. This article recognizes the phenomenon of the generation of free acid when yeast is used in brewing and distilling processes and the fact that such acids may

---

[1] Henneberg was referring to brewing and distilling yeasts.

be rendered innocuous by the addition of lime salts.

In his specification in the patent sub judice Hayduck states, "An outstanding novel and technically important feature of my present invention as compared with the process described and claimed in my aforesaid copending application Serial No. 420,829[2] resides in the fact that by means of the careful neutralization of the aforesaid acid components set free are neutralized either entirely or to an extent that they no longer affect the yeast unfavorably whereby yeast yields may be obtained which have not been obtainable hitherto by any process and which could not have been predicted from the known facts."

██ If we compare these words of Hayduck's specification with Henneberg's article, we think it is apparent that Hayduck was aware of Henneberg's work and therefore Hayduck did not himself discover the operation of the natural law which Henneberg referred to. While it is true that Henneberg was dealing with yeast in brewing and distilling processes and not with the manufacture of yeast in our opinion invention cannot rest upon such a ground of distinction in the closely allied fields of brewing, distilling and yeast making. It must also be borne in mind, as appears from the opinion in Fleischmann Yeast Co. v. Federal Yeast Corp., supra, at page 192, that Hayduck was a coworker with Henneberg in the Technical-Scientific laboratory of the Institute for Fermentation Industries in Berlin, and that Henneberg conducted laboratory experiments to discover why certain nitrogenous substances killed yeast while Hayduck conducted large scale experiments in breweries to the same end.

Knowledge of the deleterious effect of acidity upon yeast was known to the art prior even to Henneberg. In an article by A. Wilfert (Presshefe, Kunsthefe Und Backpulver) published in Vienna in 1890, reference is made to the disadvantageous action of sulphuric acid on yeast when it is present in large amounts and the article states that if it is desired to remove the acid from the mash it may be done simply by adding slaked lime to the neutralizer. Slaked lime is calcium hydroxide and is an antacid. Wilfert states, "The sulphuric acid acts disadvantageously on the development of the yeast only when it is present in large amounts; conversely, a small amount of sulphuric acid is highly beneficial for the development of the yeast, as it contributes considerably to the production of a very pure and vigorous yeast. The yeast plant requires for its vigorous growth a liquid which is slightly acid; apart from the fact that this constitution of the liquid promotes the development of the yeast plant, it renders the development of fission fungi almost entirely impossible, inasmuch as the latter, as experience has shown, can thrive well in neutral and alkaline liquids but cannot develop in acid liquids."

In Pollak's Swiss Patent of 1913, entitled "Process of Acidifying Fermenting Substrates by the Use of Ammonium Compounds", reference is made to the creation of a natural acidification in the mash in a plurality of the processes used in the fermenting industry to increase the fitness of the liquid. Pollak also states that if it is desired to push the formation of acid further and also to impart greater intensity to the physiological processes taking place at the same time, " * * * the already existing acid concentration which interferes with the fermentation, must be reduced by neutralizing by means of an alkali." He then states as the gist of his invention that it is new to use " * * * ammonia compounds, e. g., ammonia or strongly alkaline ammonium compounds for

---

2 In the patent specification Hayduck in respect to his copending application states: "In the production of yeast in accordance with the process described in German Patent No. 300,663, and in my corresponding copending application for United States Patent Serial No. 420,829, filed October 30, 1920, there takes place in solutions of sugar and inorganic salts, even when no bacterial infection sets in, a considerable increase in the acid content of the nutrient solution in which the yeast is produced. The resultant acidity is, for the most part, of an inorganic nature, and such inorganic acid is released from the inorganic salts used, the basic parts are used to a large extent as nutriment by the yeast, while the residual acid parts remain. This selective partial utilization by the yeast of components of inorganic salts present tends to result in an accumulation of acid products or free inorganic acids and tends increasingly to acidify the solution in which the yeast is being propagated or grown. Because of the presence of these free acids, the yeast, as can be seen by examination of the same with a microscope, is influenced unfavorably if the acids exert their action unrestrainedly upon the yeast for any considerable length of time."

820

instance, in a manner such that they are repeatedly added to the fermenting substrates with the object of repeated partial neutralization of the acid resulting from the fermentation." It is true as is pointed out by the learned District Judge in Fleischmann Yeast Co. v. Federal Yeast Corp., supra, page 191, that Pollak's process is to be employed with the end result of increasing the acid, increasing the yield of the yeast thereby, but the fact remains that Pollak did disclose a method of control of acidity by neutralizing acids by means of the "ammonia compounds, e. g., ammonia or strongly alkaline ammonium compounds."

The Hayduck patent describes a suitable yeast nutrient solution containing sugar, ammonium sulphate, ammonium dihydrogen-phosphate, potassium sulphate, gypsum and magnesium sulphate, but Hayduck does not claim that the successful working of his process depends upon exact measurement of the amount of chemicals used to the end that harmful acidity may be reduced or done away with. In other words, he claims no formula depending for its effect on precise and exact neutralization and, moreover, he states, " * * * for neutralization of the acid components calcium carbonate may suitably be employed, but other basic or antacid substances such as antacid substances containing or supplying nitrogen can also be employed for the neutralization, for example ammonium carbonate."

The first claim of Hayduck's patent is typical. It claims, "The process of manufacturing yeast which comprises preparing a yeast nutrient solution and propagating yeast therein with aeration,[3] said yeast nutrient solution containing essentially sugar material and yeast nourishing inorganic salts from which components are liberated which tend increasingly to acidify the nutrient solution during propagation, and during the period of propagation neutralizing the deleterious excess of such acidity."

It should be noted that every claim in the patent is a process claim. Some of them refer to a process of neutralizing the excessive acidity " * * * by the addition of an innocuous antacid substance." One refers to neutralizing by an innocuous carbonate and one by ammonium carbonate.

The use of calcium carbonate as the antacid substance is referred to in the specification.

As we have stated, there is nothing new, nor is it claimed that there is anything new or patentable in the use of sugar or in the use of molasses with inorganic salts, such as ammonium sulphate to create nutrient solutions for the manufacture of yeast. The element of invention claimed by Hayduck consists in the production of unusually large yields of yeast by the use of a neutralizer for the acid components during the period of the propagation of the yeast.

To sum up the situation in respect to the prior art, we think that it cannot be denied that the use of antacid or basic materials as neutralizers for acidity in respect to yeast is old in the art. At times the application of antacid materials has been made when acidity has been induced in the fermenting vat; at times, when it has arisen there undesired. The repulsion of acidity in distilling and brewing with yeast was early made known to the art by Henneberg and others. At the most, in the patent sub judice Hayduck has applied the prior art to the propagation of yeast when acidity was deleterious and unwanted. At the least, he has not done as much as this since Wilfert disclosed the principle upon which Hayduck rests his disclosure in respect to the propagation of yeast. We think that Hayduck has simply set forth a technique which is useful in the manufacture of yeast under modern methods. Hayduck's disclosures do not attain to the dignity of invention. His process is the result of the exercise of the skill of the calling, the application of an old principle to a similar or analogous subject with no change in the manner of application and without any substantially different result.

█ For these reasons we hold Hayduck –103 to be invalid for want of invention over the prior art. Altoona Publix Theatres v. American Tri-Ergon Corp., 294 U. S. 477, 486, 55 S.Ct. 455, 79 L.Ed. 1005; Paramount Publix Corp. v. American Tri-Ergon, 294 U.S. 464, 473, 55 S.Ct. 449, 79 L.Ed. 997; De Forest Radio Co. v. General Electric Co., 283 U.S. 664, 51 S.Ct. 563, 75 L.Ed. 1339; Pantex Pressing Machine v. United States Hoffman Corp., 3 Cir., 44 F.2d 685, 688.

---

[3] A process well known to the art consisting of stimulating the growth of the yeast by putting air into or through the nutrient solution.

### As to Hayduck Patent No. 1,449,105.

This patent is described as a "Low-Alcohol Yeast Process" and describes a process for the manufacture of yeast in such a way that the production of alcohol in the fermentative process is kept at a minimum. Claim 4 of the patent is typical. It is for "A process of propagating yeast with a relatively low yield of alcohol which comprises preparing a wort containing all essential yeast nutrients in solution, initiating propagation of yeast in a diluted portion of said wort, aerating the diluted portion, and substantially continuously adding during the period of propagation, a wort of higher concentration, at a rate such that the yeast may propagate and substantially all of the alcohol which may be formed is assimilated by the yeast." As the fermentative process takes place alcohol is generated in the nutrient solution by the feeding yeast. The patent contemplates the management of the process in such a wise that the nutrient solution will be kept at such a relatively low concentration that the amount of alcohol produced will never go beyond that which the feeding yeast can absorb.

In the patent specification Hayduck describes his process as follows. A wort suitable for yeast propagation is prepared, having a gravity of 12° Balling. A portion of this wort is placed in the fermenting vat and is diluted for example to about 1° Balling. Seed yeast is thereupon added to the solution, aeration takes place and the process of manufacturing yeast begins. The remainder of the concentrated wort is added " * * * slowly and substantially continuously throughout a protracted period of time and at a rate such that not only the alcohol which may have been formed from the quantity of sugar present in the diluted portion of the wort, but also any alcohol which may be formed from the sugar which is present in the added wort, can be assimilated immediately by the yeast." The gist of the patent therefore is for a rate of feeding the wort into the nutrient solution already in the fermenting vat.

We think there is no doubt but that Hayduck clearly recognized that it was old in the art to dilute the wort to such an extent that the alcohol produced from the sugar could be assimilated again by the feeding yeast as part of its nourishment. Hayduck refers to Rainier's German patent, No. 10,135, stating in effect that the German patent endeavors to reach the same goal as himself by adding to the nutrient solution peptones continuously and sugar at intervals and teaches that by keeping the sugar concentration low the formation of alcohol is prevented, the sugar serving of course as a nutrient. Hayduck states, however, that the operation of the process described by Rainier requires the estimation of the sugar and peptone content prior to further additions of the respective solutions containing these nutrients and it therefore lacks the simple operation characterizing his process which permits the use of concentrated wort.

We are convinced, however, that there is little difference in substance between beginning fermentation with a wort at 1° Balling and adding nutrient solution of 12° Balling from time to time to prevent the excess production of alcohol as taught by Hayduck and beginning the fermentative processes with such a low concentration of sugar in the nutrient solution that the feeding yeast will not produce excessive alcohol as taught by Rainier, particularly when it is borne in mind that the extent of permissible concentration of the nutrient solution in relation to the production of alcohol must be ascertained by tests made as the yeast manufacturing process progresses. No other method of ascertaining the rate at which the concentrated nutrient solution is to be added is disclosed by Hayduck. Both Hayduck and Rainier endeavor to control the production of alcohol by the feeding yeast simply by restricting the extent of the field in which alcohol can be formed.

It was well known to the prior art that if the creation of alcohol was not desired the nutrient solution should contain a low concentration of sugar. Iwanowski, in his article published in 1903 in the Journal of the Society of Chemical Industry, points out that " * * * the higher the concentration of sugar in the nutrient solution, the stronger is the alcoholic fermentation; * * * in solutions which contain about 0.5 per cent of sugar and about double that quantity of peptone, hardly any alcoholic fermentation is to be observed."

█ In our opinion the process described by Hayduck may constitute a mechanical improvement over the prior art but it is no more than this. But even if the process disclosed by Hayduck be held to constitute invention, the patent is invalid for

indefiniteness as was held by the learned District Judge. Both the times and manner in which the concentrated nutrient solution is to be added may be ascertained as we have stated solely by experimentation. The disclosure of the patent is therefore too vague and indefinite to constitute invention.

■ In our opinion the validity of the disclosure of the patent is not aided by providing as does Hayduck that the quantity of diluted wort originally placed in the fermenting tank is so chosen that the mean content of the entire wort employed would be 3° to 5° Balling. This instruction neither adds to the ease with which the calculation of the Balling content of the nutrient solution in the fermentation tank can be ascertained nor does it add anything original to the processes of the prior art. It is settled that if the disclosure of a patent is so indefinite as to require independent experiments, the patent is void. Chemical Rubber Co. v. Raymond Rubber Co., 3 Cir., 71 F. 179; George K. Hale Mfg. Co. v. Hafleigh & Co., 3 Cir., 52 F. 2d 714; Health Products Corp. v. Ex-Lax Mfg. Co., Inc., 2 Cir., 22 F.2d 286.

### As to Hayduck Patent No. 1,449,106.

■ It is stipulated by the parties that this patent combines the processes of Hayduck –103, including the principle of neutralization, and the processes of Hayduck –105, including the regulated rate of feeding the nutrient solution. Since we have found patents Hayduck –103 and Hayduck –105 to be invalid it follows that we find this patent to be invalid since combining the processes of invalid process patents cannot result in validity.

### As to Hayduck Patent No. 1,449,109.

■ The learned District Judge held "* * * this patent covers the same field as those hereinbefore considered. Its disclosure of the use of a nitrogenous neutralizing agent adds nothing to the art since Hayduck No. 1,449,103 makes that disclosure. It is therefore invalid." It is very difficult to distinguish any substantial difference between the disclosures of this patent, –106 and –103. It is claimed by its proponent that the process of the patent combines the process of Hayduck's –105, namely, regulated nutrient feed but with an additional factor of supplying to the nutrient solution a chemical substance possessing assimilable nitrogen and also having an alkaline or antacid reaction, such chemical to be fed to the fermenting tank along with the reserve nutrient solution as the latter is needed.

We have already stated our reasons for holding the neutralization patent, Hayduck –103, and the regulated rate of feeding patent, Hayduck –105, to be invalid. The two processes referred to are old for the reasons we have heretofore stated, but in his specification in –109 Hayduck refers to the use of ammonium sulphate to be "* * * set on with the seed yeast." He states: "The remainder of the nitrogenous substance required for supplying necessary yeast assimilable nitrogen for the yeast, is added in the form of free ammonia (ammonia water), to the relatively concentrated nutrient solution * * *." But there is nothing new in the use of ammonium salts in a nutrient solution. Mohlant's British Patent No. 11,617 refers to the use of ammonium phosphate in fermentation and distillation processes. Fritche's Austrian Patent, 45/4047 refers to ammonium salts, particularly ammonium sulphate, to "* * * serve as nutrients for the yeast cells." Pollak's Swiss patent, heretofore mentioned, refers to the use of ammonium carbonate or carbamate. The ammonium salts referred to in Hayduck –109 are thus shown to be old in use for the very purposes for which Hayduck's process makes use of them.

■ Since the component parts of the process set out by the patent are old it follows that a combination of these processes contain no novelty and the patent is void for want of invention.

### As to Corby and Bührig Patent No. 1,673,375.

■ The disclosures of this patent are in substance analogous to those of Hayduck –105 and Hayduck –106, with the exception that the patent teaches that a portion of the nutrient solution may be withdrawn periodically from the fermenting tank, the residue diluted, new nutrient solution added with a continuation of the process of propagation of the yeast in the fermenting tank.

The learned District Judge aptly likened the disclosure of this patent to the action of a farmer harvesting a portion of an agricultural crop and re-seeding the area from which it came. The proponent of the patent asserts that the analogy is unsound, that what the patentees did was

in fact to harvest a portion of the crop, then restore the starting conditions of the solution and then grow another crop without re-seeding. If such was in fact the case it is our opinion that the process disclosed would not only be patentable but would constitute a phenomenon unknown to nature. An examination of the process discloses, however, that the yeast remaining in the nutrient solution fructifies itself in the fresh nutrient solution which is added after the old is withdrawn. There is no element of patentable novelty in the conception disclosed in the patent.

The decree of the District Court of November 30, 1937, is reversed in so far as the same adjudicates claims 1 to 4, inclusive, and 7 to 15, inclusive, of Hayduck –103 to be valid, grants an injunction and directs recovery by Standard Brands, Incorporated, by way of accounting against National Grain Yeast Corporation, and the cause is remanded with directions to dismiss the bill of complaint in toto. The decree of the District Court is in all other respects affirmed.