### OSBORN MFG. CO. v. NEWARK BRUSH CO.

Civ. No. 224.

United States District Court
D. New Jersey.
March 30, 1953.

---

14. This Court is not intimating by this statement that our public policy is being offended.

Snevily & Ely and Addison C. Ely, Westfield, N. J., Oberlin & Limbach and John C. Oberlin, Cleveland, Ohio, of counsel, for plaintiff.

Stoddard & Stoddard and Frederic Stoddard, Irvington, N. J., Pennie, Edmonds, Morton, Barrows & Taylor and George E. Middleton, New York City, of counsel, for defendant.

HARTSHORNE, District Judge.

This is an action by plaintiff, Osborn Manufacturing Company, for the infringement by defendant, Newark Brush Company, of the Peterson patent 2,388,867 applied for March 23, 1942, granted November 13, 1945. The patent is as to a method of treating brushes or brush sections generally of Tampico bristles, which, when revolved, are used to polish and shape metals and plastic articles. The treatment consists of impregnating them with a tacky, viscous substance. Plaintiff claims there arises from such treatment certain improved results, as set forth in claims 1, 2, 3,[1] claim 4 not being involved, since it is based upon the use of a solvent, which both sides agree is presently immaterial.

Defendant answers the complaint, claiming that it does not infringe in that the patent is invalid for (a) anticipation, (b) lack of invention, (c) inadequacy of disclosure.

The findings of fact and conclusions of law, F.R.C.P. rule 52(a), 28 U.S.C. are as follows:

Findings of Fact.

1. Plaintiff is an Ohio corporation; defendant is a New Jersey corporation. Both are engaged in the manufacturing and selling of various types of brushes.

2. Defendant's brushes, as presently produced, have bristles coated with a tacky fluid, which obtain the same advantages, and in much the same manner, obtained by plaintiff's brushes treated under the above patent.

3. Beginning in 1932, long prior to the filing of the patent in suit, defendant has continuously treated rotary Tampico fiber brushes by immersing them in a bath of alkali refined fish oil of either menhaden or sardines. To this approximately one per cent of Japan dryer was added. After immersion and removal of the brushes from such fish oil, similarly conducted for many years prior to the patent to the method set forth in the patent, the brushes were permitted to drain and dry. As so treated, the bristles were left with an adhesive or tacky coating, which hardened them and enabled them to carry more abrasive and otherwise operate more effectively than if untreated. This treatment was carried on in the ordinary course of defendant's business, at its plants in Newark, and thereafter Kenilworth, New Jersey, the treated brushes being sold and

---

[1] "1. A rotary brush comprising an annular brush back and brush material extending radially therefrom, such material comprising bristles coated with a tacky fluid of the type which wets such bristles, whereby when the brush is rotated lateral compacting of the outer portions of such bristles is resisted.

"2. An annular rotary brush having filamental brushing material coated with a tacky substance effective to limit axial compacting of said material in use while assisting in the formation of a firm brush face, said filamental brushing material nevertheless retaining its ability to separate during normal operation in engagement with a work piece.

"3. A rotary brush comprising an annular brush back and brush material extending radially therefrom, such material comprising bristles coated with a tacky fluid of the type which wets such bristles, whereby when the brush is rotated the inner portions of such bristles tend to adhere together and lateral compacting of outer portions thereof is minimized."
Claims 1, 2 and 3, Patent, page 3, column 2, lines 24 through 46.

commercially used in this country for their intended purpose long before March 23, 1941.

This finding is amply supported by the evidence of no less than six different witnesses, four of whom had no connection with defendant, save that they had been familiar for years with defendant's brushes as middlemen or customers, one, indeed, being a competitor—Nicholls, of the Felton Company of Manchester, New Hampshire. How defendant came to treat its brushes in this way, first with fish oil, and almost immediately thereafter with Japan dryer, comes from the mouth not only of defendant's officer in charge, but from the lips of the individual workman who suggested these treatments, with peculiarly convincing circumstantial evidence as to veracity in that regard. For instance, the use of fish oil was suggested back in 1932 by one Stellwagon, who came into defendant's employ from that of the Felton Company above, where, as Nicholls, the Felton man, previously testified, fish oil had been used to treat brushes since 1927. The dryer idea—to make the fish oil more tacky—came from Bankel, a workman of defendant's, now a retired foreman. He not only testified as to his having suggested the use of a dryer back in the early 1930's, but that, in fact, he had used a dryer with fish oil on a special job with brushes for defendant as far back as 1910. This latter statement came from his lips, not in response to a question, but spontaneously, with every indication of its being the truth. Added to these witnesses, and their insistence that the treatment by defendant was essentially the same over this long period, corroboration comes from the lips of Nicholls, the employee of defendant's competitor, the Felton Company in Manchester, New Hampshire, from Luithle, of Curtiss-Wright, from Kelshaw, the middleman who sold defendant's brushes from 1933 to 1949 to Curtiss-Wright, and from Hoy, another middleman, who has sold defendant's brushes since 1934.

As opposed to this testimony on "prior use", plaintiff offers simply the testimony of Peterson, its officer, who was the inventor, and Rowland, its former sales manager. The net effect of the testimony of these two witnesses in this regard is simply that, originally, defendant's brushes were less tacky than they are now. Regardless of its comparative paucity, this testimony, coming solely from biased witnesses, goes not to a specific fact, such, for instance, as the use of dryer, but as to a mere matter of degree—the tackiness of defendant's brushes now, as compared with the witness' memory as to the way defendant's brushes felt in their hands some fifteen or twenty years ago. Bearing in mind that everybody agrees that fish oil alone is somewhat tacky, and that the brushes which defendant's witnesses felt years ago had been used and subjected to heat, which tends to soften them up, it is obvious that no great weight can be attached to the necessarily dim, and purely relative, recollection of these two witnesses.

From defendant's vouchers, in evidence, little can be gathered either way, since they appear so incomplete, showing but one sale of treated brushes in 1946 and 1947, for instance, and with no vouchers for purchases of Japan dryer from 1945 to 1948. However, there are vouchers showing defendant's purchases of Japan dryer for every other year from 1939 on to 1950. This corroborates the above verbal testimony for the defendant, that Japan dryer was used to increase the tackiness of their fish oil treatment for years prior to the patent.

Plaintiff stresses its display exhibit 23, purporting to show the difference in the effect of the use of a dry brush, of a brush treated with fish oil only, and of brushes treated under the patent and as now treated by defendant. The parties agree that the brush as now treated by defendant is the equivalent of plaintiff's patent treatment. Nor is the "knifing" effect, resulting from the brush treated solely with fish oil, very material, in view of the clear evidence that defendant's brushes were never sold, as so treated, but when treated at all, always had dryer added to the fish oil, admittedly making them more tacky, and thereby lessening the knifing effect. In addition, the brush

so used in exhibit 23 had not been allowed time to dry, contrary to defendant's custom, which would also affect its tackiness, and hence its knifing, as the patent itself claims.

Plaintiff's final claim as to this prior use by defendant is that the Japan dryer which defendant used was of better quality and did a more effective job, after the patent than before. However, the witness who so testified, admitted that the dryers which existed in the 1930's did make fish oil brushes tacky, anyway. So when defendant, after the patent, ordered Japan dryer just as it did before, it adopted not a different, but exactly the same, method. Any possible difference in result was thus simply "a difference of degree and not of kind." Minnesota Mining & Mfg. Co. v. Int. Plastic Corp., 7 Cir., 1947, 159 F.2d 554, 556. There was no "new mode of operation" or "new function or property". There was simply the substitution of superior for inferior materials. This is not invention. Fowler v. Honorbilt Products Co., 3 Cir., 1942, 131 F.2d 153, 155. Nor did the patentee allude to this improved dryer in his patent, or even discover it, so that he could base a claim thereon. Sinclair & Carroll Co. v. Interchemical Corp., 1945, 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644.

4. The claimed invention of the patent in suit was anticipated by the public manufacture, use and sale in this country of fish oil treated Tampico wheel brushes, not only by defendant, but by S. A. Felton Sons Company of Manchester, New Hampshire, and the Wright Aeronautical Division of Curtiss-Wright Company of Paterson, New Jersey, more than one year prior to the filing of the application for the patent in suit.

As to this finding, as seen above, there is no question but what the fish oil treatment of brushes makes them adhesive or tacky. All a dryer does, is to speed up the drying of the oil on the brush, thus permitting the brush to retain more oil—and more tackiness—than it otherwise would in a short period. Obviously, therefore, the longer a brush treated with fish oil stood on the manufacturer's shelves, the more tacky it would become. And if it stood there long enough, it would therefore attain the tackiness of a fish oil treated brush with dryer added. Thus, such a brush would tend to attain the very results which plaintiff claims to be the heart of its patent. Thus the difference between such a fish oil treated brush and the patent treated brush is again but a difference in degree, and not in kind.

That both the Felton Company in New Hampshire and the Curtiss-Wright Company in Paterson produced these fish oil treated brushes long before plaintiff's patent, is proven not only by the witnesses above alluded to, but by reference to the exhibits in evidence of the 1899 pamphlet, page 9, of Quinby, the company which Felton bought out, same referring to "Quinby Oil Tampico Brushes * * * saturated with a peculiar oil unexcelled for its adhesive properties". It is also proven by the Felton pamphlet of 1930, page 11, referring to "Quinby Treated Tampico Wheels" of similar character, both showing their use and sale of fish oil treated brushes from these early dates.

5. The claimed invention of the patent was anticipated by the United States Navy in its printed specifications 38 B 27, 38 B 27 A, 38 B 27 B, published more than a year prior to the filing of the application for the present patent, and by the Quinby Brush Company's printed catalogue, published in 1899, and the S. A. Felton Sons Company printed catalogue of 1930.

As to this finding, the Quinby and Felton publications are sufficiently described above. The Navy publications are to similar effect. For instance, 38 B 27, published June 1, 1928, calls for a Tampico fiber wheel brush "uniformly coated, and the space between the bristles filled with a semi-solid, adhesive, homogeneous mixture of suitable gums or resins in oils, which shall prevent undue splitting or wearing away of the bristles during use and permit the fiber to carry a large amount of emory, corundum or other cutting compound". In short, this Navy publication calls for the treatment of Tampico fiber brushes by the very material called for in plaintiff's patent, and to

achieve several, at least, of the very results alluded to in such patent. The fact that another result of such treatment by Quinby, Felton, or the Navy, was not put into words is of course immaterial, if it existed in fact, as it did to some degree at least.

6. The failure of the file wrapper to allude to the "prior art" indicates same was not called to the attention of the Patent Office when the patent was granted.

7. The patent, particularly its specifications, do not set out the manner and process of making and using the patent in such full, clear, concise and exact terms as to enable any person skilled in the art of brush making to make and use it.

This finding is established first, by the fact that the patent states no critical limits as to the manner and process of its making or use. Essentially, it says that if "viscid tacky oil" is applied to bristles, beneficial results will follow. Regardless of the fact that viscid tacky oil had long been so applied, it does not say how tacky the oil should be, nor how tacky the brush should be after applying the oil. It simply says the "treating material should also be sufficiently tacky" to attain the desired results. Indeed, it indicates that this degree of tackiness may vary widely. For the patent expressly says the "degree of tackiness * * * may vary within a wide range." Nor are these critical degrees of tackiness indicated as to the different materials recommended for use. The patent gives as examples of materials that will work, either "1. soya bean oil" or "2. soya bean oil with additions of alkyd resins", or "3. soya bean oil with additions of alkyd resins and tack additives such as 'vistanex' ", or "4. 'vistanex' alone", plus others. Nor does the patent state either what amounts of such materials are to be used, what proportions of the soya bean oil, as compared with the alkyd resins, or with the vistanex, should be used, nor how tacky either of such ingredients, or the net result, should be.

Furthermore, in the absence of any such statement of critical limits, the patent requires its user to experiment. It says "treating materials * * * will be selected to attain the desired degree of tackiness". But it gives no hint as to how that desired degree is to be attained, save by unlimited experiment.

Again, it does not attempt to describe its process fully. It does say that the brush shall be dipped in this uncritical liquid, and should thereafter be withdrawn —this being the constant practice in the prior art. But as the testimony clearly indicates, after withdrawing, the treated brush cannot be used immediately. A drying period must ensue. The patent says not a word as to such necessary drying period.

Finally, the patent makes no distinction from the prior art. It fails to state that in the prior art, as seen above, brush sections had had tacky oils applied to them, both with and without tack additives, these tacky oils including, among others, "menhaden oil", which the patent itself recommends. Further, these applications to the bristles were made in the very mode described by the patent, and with tacky results alluded to by the patent as its object.

The patent's disclosure is thus inadequate.

## Conclusions of Law.

1. This Court has jurisdiction of this cause.

2. The invention in question was "in public use" and "on sale in this country, more than one year prior to the date of the application for patent in the United States". The patent is therefore invalid.[2]

This conclusion follows because tacky liquids of the same character called for by the patent, had been applied by substantially the same process called for by the patent, to perform the same offices and under the same principle alluded to by the patent, long prior to the patent. If slight improvement in the dryer, used prior to the patent by others, occurred subsequent to the patent, the improved result was not patentable, as the improvement was one "simply in degree, not in kind." Minne-

2. 35 U.S.C.Patents (1952) § 102(b).

sota Mining & Mfg. Co., supra; Smith v. Nichols, 1874, 21 Wall. 112, 119, 22 L.Ed. 566; Ives v. Hamilton, 1876, 92 U.S. 426, 430, 23 L.Ed. 494, 495. Such being the case "the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art" of brush making.[3] A brush-maker would certainly know that, since an ordinary dryer improved the needed tackiness, an improved dryer would improve tackiness. Those who used the prior art always intended to achieve, and did achieve, improved efficiency in their brushes from the use of a tacky liquid, and for the general purposes claimed by plaintiff in the patent. But the prior artisans, being but artisans, of course did not attempt to put these general purposes into precise words, as did the patentee. Therefore VanHeusen Products v. Earl & Wilson, D.C.S.D.N.Y.1924, 300 F. 922, 930, is beside the point. For in that case, where the essence of the patent was the use of a multiple-ply interwoven fabric to obtain a starchless stiff collar, the prior patentees, such as Willard "had no such purpose in mind, and one might go on forever following his patents, without ever making a starchless stiff collar." Obviously, where neither the purpose nor the process of the prior patent, or of the prior art, would produce the results claimed in the subsequent patent, they would not suffice to invalidate such subsequent patent. But au contraire, where, as here, both the prior process and the main purpose of the prior art were the same as that of the subsequent patent.

■ 3. The invention in question was "described in a printed publication in this * * * country * * * more than one year prior to the date of the application

for patent in the United States". The patent is therefore invalid.[4]

This conclusion follows similarly from the discussion of Conclusion 2 and from Finding 5.

■ 4. Since the Patent Office was not advised of the state of the "prior art" by the applicant, or otherwise, at the time the patent was granted, the presumption of its validity, arising from its granting, is much weakened. Gomez v. Granat Bros., 9 Cir., 1949, 177 F.2d 266, 268, 3 Walker on Patents, page 2010 (Deller's Ed. 1937).

■ 5. The failure of the patent to disclose its critical limits, its failure to describe fully its process, the fact that experiment, within no critical limits, is requisite to apply it successfully, the fact that it makes no distinction as to the prior art, all render the patent invalid for non-disclosure.[5]

■ When no critical limits of the patent are set out, and it "simply talks in terms of effects", and where the patent compels those skilled in the art to which it pertains to experiment, in order to use the patent, the patent is void for non-disclosure. Standard Oil Co. of Cal. v. Tide Water Associated Oil Co., 3 Cir., 1946, 154 F.2d 579, 584; Standard Brands v. National Grain Yeast Corporation, 3 Cir., 1939, 101 F.2d 814, affirmed 1939, 308 U.S. 34, 38, 60 S.Ct. 27, 84 L.Ed. 17.

■ "The statutory requirement of particularity and distinctiveness in claims is met only when they clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise." United Carbon

---

3. Id. section 103.

4. Id. section 102(b).

5. "Application for patent * * * shall include: (1) a specification as prescribed by section 112 of this title * * *." Title 35 U.S.C.Patents (1952) § 111.

"This specification shall contain a written description of the invention, and of the manner and process of making and

using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention." Title 35 U.S.C.Patents (1952) § 112.

Co. v. Binney & Smith Co., 1942, 317 U.S. 228, 236, 63 S.Ct. 165, 170, 87 L.Ed. 232.

Since the patent in question is invalid, there can be no infringement, and plaintiff's suit fails. An order for judgment for defendant will be presented accordingly.