**STANDARD OIL CO. OF CALIFORNIA v. TIDE WATER ASSOCIATED OIL CO.**

Nos. 8605, 8658.

Circuit Court of Appeals, Third Circuit.
Argued Oct. 12, 1945.

Decided March 26, 1946.

Leonard S. Lyon, of Los Angeles, Cal. (Pillsbury, Madison & Sutro and Felix T. Smith, all of San Francisco, Cal., and Lyon & Lyon and Frederick S. Lyon, all of Los Angeles, Cal., on the brief), for appellant.

Ward D. Foster, of Los Angeles, Cal. (Harris, Kiech, Foster & Harris, Ford W. Harris, Clarence F. Kiech, and Ford W. Harris, Jr., all of Los Angeles, Cal., and Richards, Layton & Finger, of Wilmington, Del., on the brief), for appellee.

Before STEPHENS, GOODRICH, and McLAUGHLIN, Circuit Judges.

GOODRICH, Circuit Judge.

This is a patent suit in the usual form. The plaintiff asked for injunctive relief against further infringement, and an accounting. The trial court found for the defendant and the plaintiff appeals. A brief statement of the facts back of the patent questions will be helpful to the understanding of the latter.

*The Problem.*

In the modern use of petroleum products as motor fuels, sulphur content is a serious detriment. The process of the patent in controversy[1] involves removal of sul-

---

[1] United States Patent 1,869,885, (1932) Davis and Hampton, Assignors to Standard Oil Company of California. There are two appeals in this case which by stipulation of the parties were ordered heard on the same record since the same question was involved in both. One appeal was taken from the District Court judgment of December 2, 1943, and the other from the amended version of that judgment. The amendments being those of form only, neither the move to amend nor the amendment extended plaintiff's appeal time, and hence the second notice of appeal.

phur from gasoline. Petroleum oil from the early days of the industry has been refined by distilling off from the crude oil body the various fractions[2] varying in weight from gasoline, one of the lightest, through kerosene to the heavier stock fraction from which lubricating oils are derived. The products of this fractional distillation are known as "straight run." These straight run fractions have from early practice been treated chemically for various purposes such as securing the desired color and clearness, removing objectionable odors and so on. Sulphuric acid has long been a recognized method of treatment. As the use of gasoline as motor fuel increased, the straight run process was found to be too wasteful; not enough of the oil was used to furnish gasoline. Further, as motors became more complex, the degree of differentiation among motor fuels had to keep pace. Intensive cracking under high pressure of the comparatively heavier straight run products has for many years been utilized as a means to both these objectives. To this new cracked distillate, there has also been application of sulphuric acid for various purposes. But in process of cracking straight run distillate with high sulphur content, the sulphur bodies are similarly cracked forming new sulphur compounds. These are much more resistant to the acid treatment. Increasing the amount of acid means that a considerable portion of the new sulphur bodies are polymerized into heavier compounds that stay in solution in the distillate, and require redistillation. Additional difficulty lies in the fact that the polymerization of the sulphur bodies is accompanied by polymerization of valuable unsaturated hydrocarbons resulting in substantial loss of the motor fuel which it is the object of the treatment to obtain.

## The Plaintiff's Patent.

On the foregoing there is no serious dispute; beyond it we come upon the facts which separate the parties in this case. Plaintiff, Standard Oil Company of California, claims it solved the problem of sulphur removal by sulphuric acid without relatively high loss of gasoline by a patented process which defendant is using without license. Defendant, Tide Water Associated Oil Company, replies that Standard has no patent rights which need be observed for a number of reasons which constitute the issues in the present litigation. The District Court, in essential agreement with Tide Water, has found as facts from the evidence that "The processes disclosed in claims 1, 2, 3, 5, 9, 10 and 11 of Patent No. 1,869,885 are not new in the petroleum refining art. * * * do not constitute an invention. * * * [and] are not sufficiently definite to enable a person skilled in the art to practice the teachings of the patent." The claims are set out in the margin.[3]

From an inspection of the claims quoted, it is to be seen that the problem of sul-

---

[2] Universal Oil Products Co. v. Globe Oil & Refining Co., 1944, 322 U.S. 471, 474, 64 S.Ct. 1110, 1112, 88 L.Ed. 1399. "The initial step in the preparation of gasoline from crude oil involves no molecular change; it consists merely in separating the light hydrocarbons in the natural mixture from the heavy hydrocarbons. This step is accomplished by heating the oil until it vaporizes and then carrying the vapors through a device familiar to industrial chemistry under the name of a fractionating tower. Such a tower is in effect a series of condensers in which the vapor mixture is cooled and the liquid condensate drawn off in separate steps. First the high boiling point constituents, reaching a liquid phase after relatively little cooling, are condensed and withdrawn; this process is repeated on the remaining constituents in successive steps as the vapors cool, until there remain only those low boiling point hydrocarbons suitable for use as gasoline."

[3] The only claims under consideration are numbers 1, 2, 3, 5, 9, 10 and 11. Of the pertinent claims mentioned, numbers 1 and 11 are representative of all. They also serve to illustrate the narrowness of difference between what may be regarded as the most general and the most specific of the pertinent claims mentioned. These two claims read as follows:

"1. A sulphur removing process of treating motor fuels containing sulphur bearing bodies and non-sulphur bearing unsaturated hydrocarbons, in which a part of the sulphur bearing bodies are removed by a selective action of sulphuric acid and a part of the sulphur bearing bodies polymerized while excessive polymerization of the unsaturated hydrocarbons is prevented, which comprises contacting such motor fuel with sulphuric acid of such strength and quantity as to have the capacity at low temperatures of selectively removing a part of the sulphur bodies and to poly-

phur removal is alleged to be effectively solved by refrigerating the sulphurized cracked distillate. Here is the core of the two principal issues. Standard claims the patent rights to this refrigerative process, and characterizes it as a means whereby (1) "selective action," a term of its own devising, is induced and (2) polymerization of hydrocarbons is concurrently decreased. The "selective action" is the solvent action of acid upon sulphur compounds while under refrigeration. This dual action is labelled the "Davis and Hampton two-step sulphur removal process." In terms of its claims the patent process circumscribes itself to the treatment of cracked motor fuel containing sulphur compounds and unsaturated hydrocarbons.[4] It sets out five coordinated phases of activity: (1) Refrigeration of the fuel, (2) "selective action" under refrigeration, (3) polymerization of sulphur or sulphur compounds under refrigeration, (4) separation of fuel from acid sludge and (5) redistillation to separate the fuel from the polymerized products. The amount of acid needed is described (in the claims already quoted) as "such strength and quantity as to have the capacity [to achieve (2) and (3) above] and to effect a material rise of temperature of reaction unless re-

strained." The refrigerative procedure is "by absorbing heat of reaction, at a maximum temperature sufficiently low to permit [(2) and (3) above] and below the temperature at which the non-sulphur bearing unsaturated hydrocarbons readily polymerize." It is admitted in plaintiff's brief that "The method is not dependent upon a critical maximum temperature of treatment nor upon a critical strength or quantity of acid." From the same source we learn that among the variables admittedly affecting the required degree of refrigeration are: (a) Composition of the cracked fuel; (b) percentage sulphur content; (c) boiling points; (d) specific gravity; (e) "extent of sulphur reduction desired or required"; and (f) "the permissible economic loss of fuel due to polymerization," which is "determined by comparison of cost of required refrigeration with the comparable value of the motor fuel otherwise lost by polymerization."

### Sufficiency of Description.

In the light of what has just been said our initial problem is whether the patent claims comply with R.S. § 4888, 35 U.S. C.A. § 33, requiring a "full, clear, concise and exact" description so that the process can be utilized by those skilled in the art.[5]

The Supreme Court has been concerned

merize a further part of said bodies and to effect a material rise of temperature of reaction unless restrained, conducting the treatment between the motor fuel and acid, by absorbing heat of reaction, at a maximum temperature of treatment sufficiently low to permit a part of the sulphur bodies to be selectively removed by said acid and a part thereof to be polymerized and below the temperature at which the non-sulphur bearing unsaturated hydrocarbons readily polymerize, separating the motor fuel from the acid, and distilling the motor fuel from the polymerized bodies."

* * *

"11. A process of treating cracked gasoline stocks containing sulphur bearing bodies and a relatively high percentage of substantially non-sulphur bearing unsaturated hydrocarbons, to retain mainly unaffected the unsaturates thereof while substantially removing the sulphur bearing bodies in which selective action of sulphuric acid of a strength not substantially less than 66° Baumé on the sulphur bearing bodies is depended upon, while excessive polymerization of the unsaturated hydrocarbons is prevented and consequent excessive loss of unsaturated hydrocarbons from the

fuel undergoing treatment is avoided, which includes conducting such treatment under such temperature conditions as to limit the temperature of the reacting acid and fuel to a temperature at which the sulphur bearing bodies are selectively removable in the acid and below a temperature at which non-sulphur bearing bodies readily polymerize, whereby such selective action is secured coincident with the control of such polymerization."

[4] Universal Oil Products Co. v. Globe Oil & Refining Co., 1944, 322 U.S. 471, 473, 474, 64 S.Ct. 1110, 1111, 88 L.Ed. 1399. "In the field of oil chemistry, the outstanding fact is the extraordinary ability of carbon and hydrogen to combine with each other into molecules containing widely varying numbers of carbon atoms with different proportions of hydrogen atoms in an almost unlimited number of different structural arrangements. These combinations, generically termed hydrocarbons, are present in great variety in crude oil."

[5] R.S. § 4888 as set out in 35 U.S.C.A. § 33 reads in part, "Before any inventor or discoverer shall receive a patent for his invention or discovery he * * * shall file in the Patent Office a written

582

with the same general problem on other occasions and has said enough about it to furnish a guide. Three things should be borne in mind, however, before turning our attention to the decisions themselves. First, we are dealing with a factual matter [6] hence prior decisions can only aid us in setting up the tests by which to evaluate the determination of fact. Second, a word may be sufficiently precise in describing one process or product and insufficient for another. Thus while "substantial" is regularly permitted as a descriptive word in most circumstances,[7] it has been regarded as insufficient in other circumstances.[8] Third, as science and art advance, words that once may have had sufficient particularity and precision have a tendency to become too loose and more specific descriptive terms are needed. This means that the illustrative value of the holding in a patent case on this point decreases with the span of years and with the rate of advance of science, though the rationale of the holding may continue to be valid.

▮ The public policy of § 4888 has been clearly expressed by the Supreme Court. "The limits of a patent must be known for the protection of the patentee, the encouragement of the inventive genius of others, and the assurance that the subject of the patent will be dedicated ulti-

mately to the public. The statute seeks to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their rights. The inventor must 'inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not.' The claims 'measure the invention.' * * * In a limited field the variant must be clearly defined." General Electric Co. v. Wabash Appliance Corp. et al., 1938, 304 U.S. 364, 369, 58 S.Ct. 899, 902, 82 L.Ed. 1402. The same language is used in United Carbon Co. et al. v. Binney & Smith Co., 1942, 317 U.S. 228, 232, 63 S.Ct. 165, 168, 87 L.Ed. 232. The latter decision goes on to point out that "The courts * * * no less than the parties-litigant, need and may insist upon the precision enjoined by the statute." The public policy behind the statute may be seen to be as strongly grounded in the necessity for adequate notice [9] as it is in the necessity to teach. The burden is on the inventor to say precisely what he has done. He must speak so clearly that he does not shift that burden to others who because of his failure to be more explicit may unwittingly invade the field covered by the patentee.[10]

▮ The most immediate test of suffi-

description of the same, and of the manner and process of making, constructing, compounding, and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected, to make, construct, compound, and use the same * * *. No plant patent shall be declared invalid on the ground of noncompliance with this section if the description is made as complete as is reasonably possible."

The last sentence of the above quotation is irrelevant here since "plant patent" refers to a botanical not an industrial plant. See 2 Walker on Patents (Deller's Ed.) 757, § 164.

[6] 2 Walker on Patents (Deller's Ed.) 1274, § 277, "It is a question of fact for a jury in an action at law, or for a chancellor in a suit in equity, to determine whether the specification, including the claim, of a patent conforms to the statutory requirements relevant to particularity. * * * That question is, in both tribunals, a question of evidence * * * and not a question of construction * * * and a patent which has

an insufficient specification will be held void."

[7] Glascock & Stringham, Patent Law (1943) 337, § 5550. See also Universal Oil Products Co. v. Globe Oil & Refining Co., 1944, 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399; Eibel Process Co. v. Minnesota & Ontario Paper Co., 1923, 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523.

[8] Glascock & Stringham, Patent Law (1943) 326, § 5405.

[9] United Carbon Co. et al. v. Binney & Smith Co., 1942, 317 U.S. 228, 233, 63 S.Ct. 165, 168, 87 L.Ed. 232: "To sustain claims so indefinite as not to give the notice required by the statute would be in direct contravention of the public interest which Congress therein recognized and sought to protect." See, for a statement including both points, Universal Oil Products Co. v. Globe Oil & Refining Co., 1944, 322 U.S. 471, on page 484, 64 S.Ct. 1110, 1116, 88 L.Ed. 1399. The court added: "In a process patent in the refining of oil, preciseness of description is essential. It is a crowded art."

[10] United Carbon Co. et al. v. Binney & Smith Co., 1942, 317 U.S. 228, 63 S.

ciency of precision in description following from the policy just outlined is that no inventor may compel independent experimentation by others to ascertain the bounds of his claims. This Court in the Standard Brands case [11] so ruled before and the Supreme Court in the same case [12] agreed. Equally necessary in derivation is the rule that difficulty in securing exactness does not mean a description may fall short of the requirements of the statute. In the General Electric case, supra, the Supreme Court said, "The Circuit Court of Appeals below suggested that 'in view of the difficulty, if not impossibility of describing adequately a number of microscopic and heterogeneous shapes of crystals, it may be * * * the best disclosure possible * * *.' But congress requires, for the protection of the public, that the inventor set out a definite limitation of his patent; that condition must be satisfied before the monopoly is granted." A caveat contained in a note [13] may have raised some doubts but if so they have since been resolved by the language of the United Carbon case, supra, "Whether the vagueness of the claim has its source in the language employed or in the somewhat indeterminate character of the advance claimed to have been made in the art is not material. An invention must be capable of accurate definition, and

it must be accurately defined, to be patentable. Cf. General Electric Co. v. Wabash Corp., 304 U.S. [364] at pages 372, 373, 58 S.Ct. [899] 903, 82 L.Ed. 1402."

In a recent decision,[14] where determination of an infringement issue turned "on the construction to be given the words, 'without substantial vaporization',[15] as they are used in the claim," the Supreme Court said, "We are of the view that 'without substantial vaporization' as used in the patent means * * * cracking as nearly as may be in the liquid phase." [16] No independent experimentation was necessary to determine the liquid phase of the process. The claim description was thus sufficiently clear despite its use of a word that taken superficially lacked precision. The use of the language "not substantially less than 66° Baumé." in referring to acid concentration in the instant case is not on its face bad for lack of clarity, therefore. This alone cannot establish or deny the compliance with the statute. We must examine the descriptions as a whole.

The District Judge found as a fact that the claims here involved "are not sufficiently definite to enable a person skilled in the art to practice the teachings of the patent." As would be expected, the plaintiff attacks this conclusion; the defendant

---

Ct. 165, 170, 87 L.Ed. 232. "The statutory requirement of particularity and distinctness in claims is met only when they clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise. A zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims would discourage invention only a little less than unequivocal foreclosure of the field. Moreover, the claims must be reasonably clear-cut to enable courts to determine whether novelty and invention are genuine."

[11] Standard Brands, Inc. v. National Grain Yeast Corp., 3 Cir., 1939, 101 F. 2d 814, 822: "It is settled that if the disclosure of a patent is so indefinite as to require independent experiments, the patent is void. * * *"

[12] Standard Brands, Inc. v. National Grain Yeast Corp., 1939, 308 U.S. 34, 38, 60 S.Ct. 27, 84 L.Ed. 17.

[13] General Electric Co. v. Wabash Appliance Corp. et al., 1938, 304 U.S. 364, 372, 58 S.Ct. 899, 82 L.Ed. 1402: "13. Different considerations may apply under the Act of May 23, 1930, c. 312, §

2, 46 Stat. 376, 35 U.S.C. § 33, 35 U.S. C.A. § 33, providing that no 'plant patent shall be declared invalid on the ground of non-compliance with this section if the description is made as complete as is reasonably possible.' " We are not here concerned with a "plant patent" of course, but the language of the note and the argument made in the General Electric case left the applicability of similar reasoning to process patents or product patents somewhat clouded until the clear statement of the United Carbon case.

[14] Universal Oil Products Co. v. Globe Oil & Refining Co., 1944, 322 U.S. 471, 480, 64 S.Ct. 1110, 1114, 88 L.Ed. 1399, see footnotes 2 and 4, involving carbon removal rather than sulphur removal.

[15] See body of this opinion and footnotes 7 and 8.

[16] Universal Oil Products Co. v. Globe Oil & Refining Co., 1944, 322 U.S. 471, 480, 482, 483, 64 S.Ct. 1110, 1114, 88 L.Ed. 1399: "The gasoline yielded by cracking oil in liquid phase is chemically different from that yielded by vapor phase cracking, and at the date of the patent, the liquid phase product was preferred."

supports it. We think it correct and will endeavor to state why we do.

In the instant case, experimentation is the only means for ascertaining the claims. When Mr. Graves, plaintiff's chemist, was asked what he meant in stating the desired ends could be achieved under the process without laboratory analysis or testing he indicated that this was possible only by assuming a typical cracked distillate.[17] But as the District Court pointed out, the variation in gasoline stocks is of paramount significance.[18] Hence, the assumption is one that does not fit the facts.

As already pointed out, [1] the amount of acid needed is described as [a] of "such strength and quantity as to have the capacity at low temperatures of selectively removing a part of the sulphur bodies and to polymerize a further part of said bodies and [b] to effect a material rise of temperature of reaction unless restrained." Part [a] simply talks in terms of effects. It requires that amount of acid, whatever it may be, that will achieve the results of selective action and polymerization under refrigeration. Such a statement is void for want of particularity just as a functional description of a product patent would be.[19]

Part [b] is also deficient on its face.[20] It is insufficient in still another respect i.e. as a suggested temperature range, for reasons to be discussed presently. The refrigerative method is described as [2] "by absorbing heat of reaction, [a] at a maximum temperature of treatment sufficiently low to permit a part of the sulphur bodies to be selectively removed by said acid and a part thereof to be polymerized and [b] below the temperature at which the non-sulphur bearing unsaturated hydrocarbons readily polymerize." Again it will be seen that part [a] speaks in terms of results; it specifies a temperature low enough to achieve selective action and polymerization. It must fail for the same reasons that part [a] of the acid description failed.[21] Part [b] brings us directly to the question of temperature range which part [b] of the acid description tacitly suggested. Mr. Halloran, plaintiff's research and development department head, could not establish an upper limit of temperature range for the process,[22] and Mr. Day, a skilled refinery technician appearing as witness for plaintiff, could not set out the lower limit of temperature range for the process.[23] It is obvious that precision is completely lack-

---

17 Q. What did you have in mind when you stated you could anticipate with a given stock securing desirable results with the Davis-Hampton process, without any test or analytical work in the laboratory? A. I assumed that it was a typical cracked distillate; normally, most typical cracked distillates respond in some beneficial way in the Davis-Hampton process.

18 "Another factor, and one which is perhaps most important, is that different gasoline stocks are acted upon in entirely different manners and, whereas comparatively low temperatures must be employed in treating some stocks before selective action is obtained, in other untreated stocks selective action is obtained without any temperature reduction."

19 2 Walker on Patents (Deller's Ed.) 813, § 171: "A claim for a process which defines it only by stating the result is just as objectionable as a functional machine claim and is void."

20 In General Electric Co. v. Wabash Appliance Corp. et al., 304 U.S. 364, 368, 372, 58 S.Ct. 899, 903, 82 L.Ed. 1402, the Supreme Court said "And we may doubt whether the language used in claim 25, taken by itself, conveyed definite meaning to those skilled in the art * * *."

"25. A filament for electric incandes-

cent lamps or other devices, composed substantially of tungsten and made up mainly of a number of comparatively large grains of such size and contour as to prevent substantial sagging and offsetting during a normal or commercially useful life for such a lamp or other device."

By comparison, part [b] above conveys even less meaning.

21 See note 19, supra.

22 Ralph A. Halloran Testimony.
Q. What is the upper limit of the reaction temperature at which this process can be applied? A. I do not know; that is asking too fetching a question, because it is probably beneficial in any range of temperatures where the heat of reaction can be suppressed; it must be beneficial in its effect on polymerization losses."

23 Mr. Day Testimony.
Q. " * * * Is there a lower limit to the temperature, which may be advantageously employed in contacting oil and acid? A. I think there may be in specific cases; if you are not getting good separation between your sludge and oil you may carry good naphtha out with your sludge if it is too cold.
Q. And that possibility increases with the reduction in temperature? A. I think that is correct."

ing.[24] There are no critical limits which set off the new results claimed.[25] We may obtain the same kind of results outside the limits as within.[26] The temperature range is neither clear nor concise.[27] Not even Dr. Hampton himself, one of the inventors, could add particularity or render the situation more concise and clear as his testimony shows.[28] After what has been said, it is not necessary to do more than mention in passing that the record also reveals instances where the same conclusions are reached on the actual mathematics of given situations. The "variant factors presented by the instant compositions of the cracked distillate" are the only determinants [29] and these clearly require experimentation in each specific case. Perhaps this is the best that could be done under the circumstances. But as pointed out before, this is not enough when the requirements of the statute are not met. Notice to the industrial public is manifestly lacking here; and the teaching help furnished is of the type that aids him who aids himself. The language of the patent claims becomes conveniently inexact and lacking in clarity "at the exact point of novelty."

To put the matter as to this phase of the case in nontechnical language, it seems to us to come to about this: The patentee says to the petroleum industry and the public: "Refrigeration of cracked distillate before sulphuric acid treatment will largely solve the problem of getting rid of sulphur compounds without losing the valuable unsaturated hydrocarbons. That will give you the solvent action of the acid upon some of the sulphur and the polymerization of most of the remainder. We cannot tell you how cold to make and keep your distillate for that depends upon a number of factors. Strength of acid is one: as to this we recommend it be not less than 66° Baumé. Quantity of acid is another factor. As to this we make no specification at all beyond such amount as the circumstances indicate. Length of exposure of distillate to acid is also a factor; likewise the chemical composition of your cracked distillate. Within limits, the more rigidly you confine your temperature rise, the smaller your loss of the valuable hydrocarbons will be. But, of course, your refrigeration costs will also be higher. You must decide which is the more advantageous to you, less end product but less refrigeration cost or more hydrocarbons and greater expense for ice. Here are some tables which show results under some of the conditions which have

24 2 Walker on Patents (Deller's Ed.) 753, § 163: "The range of limits must be set forth precisely and must produce the new result claimed by the invention. If the limits are too broad so as to include inoperative ranges then the patent may be invalidated.", citing Eisenstein v. Fibiger, C.C.N.J.1908, 160 F. 686, 687, 688; Merrill v. Yeomans, 1876, 94 U.S. 568, 573, 24 L.Ed. 235.

25 2 Walker on Patents (Deller's Ed.) 755, § 163: "The limits set forth in a specification to define an invention must be critical limits within which the new results of the invention may be obtained and outside of which no new results can be obtained," citing Brady Brass Co. v. Ajax Metal Co., 3 Cir., 1908, 160 F. 84, 86–90.

26 2 Walker on Patents (Deller's Ed.) 1944 Supplement p. 9: "Limits are not critical if the results obtained by using proportions within the claimed range do not differ in kind from those produced by using amounts outside it."

27 2 Walker on Patents (Deller's Ed.) 813, § 171: "In cases where the description relates to a process, the claim should cover all the necessary occurrences in that process and cover no more. If it covers less it will be void for want of utility [Bracewell v. Pas-

saic Print Works, 107 F. 467]; and if it covers more, it can be evaded by persons who omit any one which is unnecessary, when using the others."

28 Wm. H. Hampton Testimony.
Q. Would you say that no selective removal occurs above 65° F.? A. I would say very unappreciably; some very small amount may.
Q. Would you indicate a maximum temperature above which no selective removal of sulphur, as the term is used in the patent, occurs? A. I couldn't say because reaction, different reactions may begin to occur at 65.

29 Plaintiff in his brief frankly states:
"These many variant factors made it substantially impossible to define the new patented method in terms of degrees of temperature under which the acid reaction should be conducted,—the temperature depends upon the variations of factors * * * just referred to. Nor is the new process dependent upon the use of specific amount or specific strength of sulphuric acid or critical intimacy or time of contact of the acid and fuel, nor upon specific maximum temperature of treatment. These all necessarily depend upon the many variant factors presented by the instant compositions of the cracked distillate."

been met. But our patent is not to be limited in its application to conditions set out in this data."

We think the District Judge was correct in concluding that the description was insufficient to meet the statutory requirements.

## Prior Art.

The second question is whether the process of the instant case is invalid for lack of invention and novelty over the prior art, because anticipated by it. Upon this question of fact the District Court made a specific finding that "The processes disclosed in * * * Patent No. 1,869,885 are not new in the petroleum refining art." The support for that conclusion must now be examined.

First a brief history of the litigation prior to this appeal is indicated. After dismissal on stipulation in another district,[30] plaintiff filed suit in the District of Delaware. The same cause of action was set out as in the California suit, viz., infringement of three patents.[31] The 809 complaint was dismissed, with prejudice, on plaintiff's motion. Of the other two, both of which the District Court found against, only the decision upon the 885 patent was appealed. Our first consideration is the effect of this 809 patent on 885, which it preceded.[32]

There is no question that 809 in every way preceded 885 and is part of the prior art. The 809 patent according to the sworn statements of Davis and Hampton, preceded 885 in conception,[33] explanation,[34] reduction to practice,[35] drawings[36] and utilization.[37] Claim 4 of the 809 patent shows a striking similarity to the 885 claims.

Claim 4 reads: "In a process of treating cracked petroleum naphtha and similar high sulphur petroleum distillates with sulphuric acid to remove sulphur bodies, substantially reducing the polymerization of unsulphured bodies by cooling the oil to below 38° F. and treating the cool oil with an acid of lower freezing point than the reaction temperature." It is at once apparent that the differences between the two patents are that (a) 885 is not limited to temperature below 38° F. as in 809 and (b) 809 requires an acid of lower freezing point than the reaction temperature. But the very differences only emphasize the essential point of similarity, namely—refrigeration[38] for the very same purposes[39] as the 885 patent and force the conclusion that

---

[30] U. S. District Court for the Northern District of California.

[31] U. S. Patents, No. 1,705,809 (refrigeration in petroleum refining); No. 1,869,885 (the patent considered herein, on appeal); and No. 1,864,755 (sludge removal from petroleum). For convenience, the patents will be referred to, hereafter, by their last three numbers.

[32] The 809 patent was filed as an application on October 15, 1924 and issued March 19, 1929, while the 885 patent was filed as an application on November 30, 1927 and issued August 2, 1932.

[33] Conception: 809, "on or about the 14th day of June, 1923"; 885, "on or about June 21, 1923."

[34] Explanation to other or others: 809, "on or about the 14th day of June, 1923"; 885, "on or about June 21, 1923."

[35] Reduction to practice: 809, "on or about the 14th day of June, 1923"; 885, "on or before July 11, 1923."

[36] Drawings: 809, "on or about the 6th day of August, 1924"; 885 "on or about the 10th day of August, 1925."

[37] Utilization: 809 "in a semi commercial scale plant * * * in August 1925" and "about September 21, 1927 * * * in a * * * commercial plant"; 885, "in an experimental plant * * *

in August 1925" and "about October 21, 1927 * * * in a * * * commercial plant."

[38] The 809 patent application states: "We have discovered that certain materials, such as sulphuric acid, when intermixed with naphtha, motor fuels or in fact most petroleum oils at low temperatures, act to remove the sulphur bodies from the same by taking such bodies into solution or forming a loose chemical combination with the same, in place of the polymerizing action involved in the present process of removing such sulphur bodies, so that upon separation of the acid from the oil the sulphur bodies are removed without any substantial removal of unsaturated hydrocarbons which are desired in the gasoline. We have also discovered that the removal of sulphur bodies by a solvent action at low temperatures is most effectively accomplished by strong sulphuric acid such, for example, as sulphuric acid greater than 97% in strength and that particularly fuming sulphuric acids, such as about 15% fuming acid, gives the best results in the solvent removal of sulphur bodies."

[39] The first paragraph of the 809 application reads "This invention relates to a process of removing sulphur bodies

the 885 patent is preceded in the art by 809. What plaintiff claims to be a generic invention following a specific improvement, we think is more accurately regarded as an attempt to enlarge a pre-existing patent to cover a field whose boundaries are marked by no monuments. The 885 patent is simply a broad attempt to preempt and monopolize the use of refrigeration in petroleum refining.

What has already been said is sufficient to support the conclusion of the District Court with regard to the 885 patent. But the dispute between these parties is obviously of considerable commercial importance both to them and to the petroleum industry generally. We shall, therefore, review the earlier inventions and publications which counsel for both sides, in what is an unusually competent and thorough presentation, have given us. Little comment will be added for the setting out of the facts of the prior art is more convincing than argument could be.

(1) In 1909, Robinson (U.S. Patent No. 910,584) patented a process of refining under refrigeration to remove sulphur. While kerosene obtained from Lima oil (descriptive of a type found near Lima, Ohio) was what the inventor was chiefly concerned with, his process covered the refining of cracked hydrocarbon distillates,[40] including cracked naphtha. The cracking methods in use at the time of the Robinson patent did not result in so high a percentage of unsaturates in the cracked distillates as modern methods give. But this factor is not a determinative one. The 885 patent does not delimit percentages of unsaturates in the cracked distillates. Moreover, Robinson describes refining of (bituminous) shale oil which contains a relatively high percentage of unsaturates. The treating temperatures Robinson recommends range from 48° to 70° F. These cut across the range used in the 885 illustration. Furthermore the limitation of temperature by Robinson is economic rather than scientific, a position strikingly similar to that of the 885 patentees.[41] Robinson speaks by way of explanation of " * * * the ability of a smaller proportion of * * * extra strong acid * * * to accomplish the same desulphurizing effect as a larger proportion of the same acid * * *" under proper conditions of low temperature; the range used being given.[42] We must agree with the District Court in saying, "It seems obvious, therefore, that Robinson's process is substantially the same as the process in the '885' patent."

(2) In 1911 the Singer article [43] appeared. It discussed the treatment of "mineral oil" distillates with sulphuric acid and noted amongst the resulting desirable changes a "smaller sulphur content." [44] Polymerization of the unsaturated hydrocarbons was discussed as a manifestation of the chemical action of the sulphuric acid.[45] The importance of temperature

---

from petroleum oils and refers particularly to a process of treating petroleum oils for preparation of gasoline or motor fuel."

40 This is his language: "The burning oil (kerosene) distillate from Lima crude oil to be desulfurized in accordance with this first part of the present invention may include all or any part of the cracked oil of a boiling point or gravity suitable for burning oil (kerosene) along with all or any part of the uncracked distillate of suitable boiling point or gravity; or it may consist of either or any part of either of them without the other; or it may include hydrocarbons too light and volatile (and consequently not safe) or not light and volatile enough (and consequently too viscous) to be suitable for burning oil (kerosene) along with hydrocarbons suitable therefor."

41 The 885 patent application states: "The relative cost of cooling and value of valuable gasoline constituents saved by reducing the polymerization loss will likewise influence the selection of the optimum maximum treating or reaction temperature to be employed and maintained in any given case."

42 " * * * Lima oil at about or below 38° F. or at another temperature substantially below about 60° F. initial * * * [as compared to] the same stock at about 60° F. initial or at any other lower temperature which is yet above 38° F. and also above that at which the smaller proportion of acid is used."

43 "Technologie des Erdols und Seiner Produkte" (The Technology of Mineral Oil and Its Products) compiled by Dr. Leopold Singer in collaboration with Dr. H. Kast, Dr. C. F. Lossen and R. A. Wischin. Published by S. Hirzel, 1911, Leipzig.

44 Id: "The distillates, treated with sulphuric acid, after neutralization show certain desirable changes, notably * * * smaller sulphur content * * *."

45 Id: "Referring now to the action of sulphuric acid in general, the same

was clearly recognized.[46] Low temperatures were specifically recommended.[47]

(3) In 1920, Hamor and Padgett, published their study [48] on the subject. The sulphuric acid they specify is 66° Bé. acid,[49] the same as in the patent before us now. Similarly, quantity, treatment and time are regarded as variables to be determined for each case separately.[50] The nature of the chemical action of sulphuric acid on petroleum distillates is said to be polymerization.[51] Sulphur is explicitly indicated as one of the compounds acted upon and temperature is stated to be one of the factors determining the completeness of the reaction.[52]

(4) In 1917 Ellis filed application for a patent [53] on the "production of acid liquor by the treatment of olefin material with an extractive acid, such as sulphuric acid * * *." In this process he teaches what is very close to the essence of the process of the instant case, though of course that teaching is only incidental to his main purpose. The olefin material of which he speaks may contain such cracked saturates as petroleum oils.[54] He indicates sulphuric acid of 1.84 specific gravity (66° Bé.)[55] Low temperature is pointed out particularly. The stronger the acid, the lower the temperature.[56] His claims indicate the general mode of procedure: adding sulphuric acid to hydrocarbon material with cooling and separation.[57]

(5) In 1917 Alexander filed patent application for a "method of purifying oils."[58] The method, according to the inventor, is shown to be particularly applicable to

---

is partly a mechanical one, and partly a chemical one. Here primarily the chemical way of action of the sulphuric acid is considered. This is manifested: * * * 3, in the polymerization of unsaturated hydrocarbons * * *."

"The decrease of the specific gravity which may be observed does not contradict the assumption of polymerization, since this decrease in weight may be the result of a differential action; a greater decrease by the removal of heavy hydrocarbons, in opposition to the increase by polymerization."

46 Id: "The action of the sulphuric acid is influenced by various factors, primarily by the temperature * * *."

47 Id: "In general it may be stated that the lower the temperature, the better the purification, and indeed the action of the temperature is twofold one; on the one hand directly, in that sulphuric acid at a relatively high temperature exerts directly other effects than at a standard temperature which is to be determined by experience for each kind of illuminating oil, on the other hand in that at elevated temperature supplemental reactions set in, which affect the substances primarily formed by sulphuric acid, in a manner injurious to the further refining process."

48 The Technical Examination of Crude Petroleum, Petroleum Products and Natural Gas, W. A. Hamor and F. W. Padgett. Published by McGraw Hill Book Co.

49 Id: "The sulphuric acid used in the refining of the crude products obtained by the foregoing methods should possess a specific gravity of 1.84 (66° Bé.); * * *"

50 Id: "The quantity of acid, method of treatment and time factors involved will necessarily vary with different crude oils as well as with the methods of distillation."

51 Id: "Chemically the reaction with olefines comprises polymerization to dipolymers and the formation of esters and hydrated esters of sulphuric acid, the latter on treatment with water forming secondary and tertiary alcohols."

52 Id: "Oxygen and sulphur compounds also are acted on to some extent by sulphuric acid, the completeness of the reaction depending upon the duration of the treatment and on the temperature."

53 U. S. Patent 1,365,044, issued January 11, 1921.

54 Id: "Such olefin material may be substantially pure or may be comprised in material containing saturated and unsaturated material, such as cracked oils, including cracked petroleum oils."

55 Id: "Preferably material of the nature of sulfuric acid of substantially 1.8 or 1.84 specific gravity is used, * * *"

56 Id: "With some olefin materials oleum or pyrosulfuric acid may be used and ordinary commercial acid, and sulfuric acid of 95%, 98%, 100% and fuming acid of say 105%, but ordinarily the greater the strength of acid used, the lower the temperatures to be used in order to maintain sulfating conditions."

57 Id: "2. The process * * * comprises gradually entering sulfuric acid of about 1.8 specific gravity into hydrocarbon material containing olefins and liquid saturated hydrocarbons, with agitation and cooling, separating the acid extract formed, * * *"

58 U. S. Patent 1,402,733, issued January 10, 1922.

cracked gasolines.[59] The use of sulphuric acid is regarded as general practice in the industry.[60] The proportions and strengths of acid to be used are noted as variables.[61] Sulphuric acid is specifically indicated and the process is said to be applicable to other oils as well as gasoline.[62] While sulphur removal is not explicitly mentioned, the inventor makes broad statements concerning extraction of detrimental impurities [63] and improvement of the character of the oil treated.[64] Finally, temperature control to remove the heat of reaction is also taught.[65]

(6) Temperature of the substance treated, which is the crux of the process claimed as a patent in the case before us, was discussed authoritatively as far back as 1895. Zaloziecki wrote in clear and unmistakable language of it.[66] His first sentence indicates that the application of temperature upon petroleum refining is his subject matter.[67] The article points out that final quality of purification is dependent on both temperature and sulphuric acid treatment.[68] It states "definitely" that the lower the temperature the better the yield, quality, purification and ease of technological method.[69] He concludes this first article of what was to become a series on the same general subject matter by noting that refiners might make use of the information to their own advantage.[70]

Apparently the advice was already superfluous. For in the very next article,[71] the opening sentence indicates that some refiners were already using the process.[72] In this article, we are also told that sul-

59 Id: "This invention relates to methods of purifying oils and apparatus therefor; and it comprises a method of purifying mineral oils, particularly applicable to cracked gasoline, wherein the oil is mechanically agitated in a flowing current with a small proportion of sulfuric acid under temperature controlled conditions; * * *"

60 Id: "In the purification of mineral oil it is the general practice to use sulfuric acid at some stage in the operation."

61 Id: "The proportions and strengths of acid and alkali stated give good results, but both are susceptible of variation."

62 Id: "In so doing in the case of cracked gasoline I employ a process consisting of several successive steps, one of these steps being a special treatment with sulfuric acid. This particular treatment with sulfuric acid however is applicable to other oils than gasoline * * *."

63 Id: "The oil treated with the acid has its color and burning qualities improved and it is also freed of various detrimental impurities."

64 Id: "I have discovered that I can treat these gasolines with sulfuric acid without the noted great loss of oil or the use of great quantities of acid, producing an important improvement in their character; * * *"

65 Id: "The action of the oil and sulfuric acid on each other will of course develop heat and therefore it may be advantageous to control the temperature in the mixing casing * * *."

66 (1895) Zaloziecki, "The Influence of the Temperature Upon the Chemical Process of Refining Naphtha," Chemiker-Zeitung, Vol. 19, No. 5, p. 78.

67 Id: "The influence of the temperature upon the refining of petroleum has heretofore been considered but little."

68 Id: "From my previous researches it was found that the temperature plays at least an equally important role in the refining of the petroleum as the said factors, namely the concentration and the purity of the sulphuric acid, and that the quality of the purified product (the petroleum) depends directly upon the temperature at which the purification with acid is carried out."

69 Id: "The rule may be set up definitely that the lower the temperature during the action of the acid upon the petroleum, the better will the purification be completed, and that with reference to the color as well as the quality of the petroleum and also the yield and the technological side of the refining process, the conditions are more favorable."

70 Id: "The petroleum refiners should try to make use of these brief indications for their own advantage."

71 (1895) Zaloziecki, "Concerning The Influence of Temperature and Light on the Chemical Refining of Petroleum," Chemiker-Zeitung (Translation of Extract) Issue of May 11, 1895, p. 875–877.

72 Id: "My brief notice in the Chemiker-Zeitung concerning the influence of temperature on the naphtha-refining process has called forth replies which state that certain refineries have already previously made use of the conclusions derived therefrom. Thus the practical advantages of the application of low temperatures have been substantiated by these communications, and will not fail to penetrate into further interested circles."

phur derivatives are within the group of constituents acted upon by a solvent action,[73] and that polymerization of the unsaturated hydrocarbons by the sulphuric acid takes place.[74] In the third article of the series [75] we find a succinct statement of the process which indicates that the knowledge available then was essentially the knowledge of the instant patent, though of course no more susceptible to proof or formula statement then than now.[76]

(7) Going back to 1907, some years earlier than any of the patents hitherto discussed, we find the Black patent application.[77] It is concerned with refining petroleum whose kerosene fraction is rich in smoky hydrocarbons.[78] But the specifications indicate that the process is equally applicable to the sulphur hydrocarbons.[79]

It also emphasizes that treatment with sulphuric anhydrid would similarly follow if sulphur removal were the desired end.[80] Temperature is clearly set out as a factor to be controlled, with low temperatures stressed.[81] The economic limitation to temperature treatment of which the instant patent speaks is also pointed out in this earlier patent by Black.[82]

(8) Finally, one may note the claims in the Isham and Lyons patent [83] application of 1923, renewed in 1935. Claim 33, specifically covers "removal of contained sulphur" as a purpose in "refining cracked gasoline with concentrated sulphuric acid" * * * "below a temperature of 60° F." * * * "to prevent substantial polymerization of the unsaturated constituents contained in the gasoline being treated." [84] It

[73] Id: "The sulphuric acid dissolves certain constituents, namely: mineral oil resins and coloring agents, mineral oil acids, sulphur derivatives (sulphides)."

[74] Id: "3. The sulphuric acid polymerizes unsaturated hydrocarbons."

[75] (1895) Zaloziecki, "Concerning the Influence of Temperature and Light upon the Chemical Purification of Petroleum." Chemiker-Zeitung No. 41, pp. 956–958 (Translation of Extract).

[76] Id: "It remains still to bring evidence for the first statement, that the dissolving, additive, and polymerizing action of the sulphuric acid takes place practically completely even in the cold. As basis for this statement—there cannot well be any talk of proofs in the case of such complicated phenomena—"

[77] U. S. Patent 968,640, issued August 30, 1910.

[78] Id: "This invention relates more particularly to the refining of * * * petroleum [whose] * * * burning oil (kerosene) fraction contains an objectionable proportion of (what are herein termed) smoky hydrocarbons, that is to say, hydrocarbons so rich in carbon that they tend to make the oil containing them smoke when such oil is burned * * *."

[79] Id: "Reference has so far been made only to California oil, * * * but there are other oils to which the invention * * * can usefully be applied * * *. There are petroleums so far analogous to California oil that they contain in their burning oil (kerosene) fractions in objectionable proportions, objectionable hydrocarbons which resist removal by ordinary concentrated sulfuric acid of 66° Bé., *, * * * Such hydrocarbons may be objectionable * * * because composed in part of sulfur (as in the

case of oils obtained from wells in Ohio near Lima, in Allen county, and in Indiana)."

[80] Id: "In obtaining burning oil (kerosene) from such an analogous oil, the same in the form of burning oil (kerosene) distillate would be subjected to sulfuric anhydrid substantially as herein above described with reference to California petroleum: only where the refractory hydrocarbons are objectionable on account of their sulfurous character the treatment would be continued until the desired (and feasible) amelioration in respect to such hydrocarbons is shown by known or suitable tests for sulfur."

[81] Id: "In subjecting the California oil, in the form of burning oil (kerosene) distillate, to sulfuric anhydrid as aforesaid, the reaction is influenced by the temperature. It is possible to carry on the treatment at temperatures not so low as twenty degrees Fahrenheit (if any) below the boiling point of sulfuric anhydrid; but it is considered an advantage and special improvement to maintain the oil during the treatment at twenty degrees Fahrenheit or more below said boiling point."

[82] Id: " * * * my experience does not tend to show that any benefit (commensurate at least with the extra cost) would result from treating the oil at temperatures below 32° F."

[83] U. S. Patent 2,145,025, issued January 24, 1939.

[84] Id: "33. The process of refining cracked gasoline with concentrated sulfuric acid for the removal of contained sulfur, which comprises passing the gasoline to be treated in a chilled condition in intimate contact with sulfuric acid in a plurality of separate treating stages in each of which the gasoline is in-

is difficult to tell, from the language quoted, whether we are back with the patent of the instant case, or concerned with an older teaching in the art. Claim 36 reads much the same except that the temperature specified is "a temperature below that at which the resulting cold concentrated sulphuric acid will cause substantial polymerization of the said unsaturated hydrocarbons." Claim 37 is the same as 36 but the temperature is given as "below 40° F." for the mixing of oil and acid and the general language is added that conditions are to be controlled "to prevent a substantial rise in the temperature by the heat evolved from the reaction between the oil and the acid." Claim 38 uses the same type of general language about temperature with reference to "each stage" of claim 33.

From what has been said the conclusion is inescapable. Plaintiff has clothed old ideas with an ephemeral semblance of novelty. The knowledge it seeks to monopolize was open for the world to see, before plaintiff showed it in his patent.

### Additional Points by Defendant.

A few incidental points remain which require brief comment. The questions briefed concerning infringement and license under the 885 patent are no longer material. Defendant urges, however, that the 809 patent should also be held invalid. The grounds are that the public ought to be protected from the threat of suits upon this patent because it is allegedly included within the broad claims of the 885 patent and hence must be equally invalid. The simple answer is that the 809 patent is not in issue before us. It was dismissed with prejudice upon plaintiff's motion to dismiss.

Defendant also seeks additional costs and expenses incurred in preparing for trial on the 809 patent. The trial court's examination of the facts led it to say, "There is nothing from which it at all appears that the suit brought by the plaintiff here was either vexatious or oppressive," and concluded that "there are no circumstances which would justify any

imposition on the plaintiff of additional costs and expenses." The defendant is not an appellant in this Court and we do not see how its argument on this point, even if it had substance, could be considered by us. Nor do we see any reason to disagree with the conclusion reached by the trial judge.

Affirmed.

timately contacted with a quantity of cold sulfuric acid and thereafter separated from said acid, continuously introducing the gasoline to be treated into contact with the acid in each stage, continuously separating gasoline from the acid in each treating stage and conducting the resulting separated gasoline into the next succeeding treating stage, and maintaining the temperature of the gasoline and acid in each treating stage below a temperature of 60° F. which is sufficiently low to prevent substantial polymerization of the unsaturated constituents contained in the gasoline being treated."